**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF WISCONSIN**
**GREEN BAY DIVISION**

| | | |
|---|---|---|
| JOSE ENRIQUEZ RAMIREZ et al, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| | ) | Case No. 1:12-cv-00210-WCG |
| | ) | |
| v. | ) | |
| | ) | |
| GLK FOODS, LLC and RYAN A. DOWNS, | ) | |
| | ) | |
| Defendants. | ) | |

**CLASS MEMBERS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION**
**FOR SUMMARY JUDGMENT OF COUNTS I AND II.**

Pursuant to Federal Rule of Civil Procedure 56 and Civil Local Rule 56, the Plaintiff

Class submits this memorandum of law in support of its motion for entry of summary judgment

as to liability on the "contract" claims presented in Counts I and II of the Second Amended

Complaint, under the federal Migrant and Seasonal Agricultural Worker Protection Act

("AWPA") and Wisconsin common law.

## <u>INTRODUCTION</u>

This is an action by a class of more than 35 Mexican nationals whom Defendants

recruited and hired to work as "trim line laborers," processing cabbage into sauerkraut, in 2011,

at their cannery in Bear Creek, Wisconsin. Defendants recruited and hired these workers under

the federal H-2B temporary "guestworker" visa program. 8 U.S.C. § 1101(a)(15)(H)(ii)(b).

The claims these workers bring are analogous to the claims brought by the workers in

*Jimenez et al. v. GLK and Ryan A. Downs*, No. 12-C-00209. But the injuries suffered by these

workers are more severe because, unlike the workers in *Jimenez*, Class Members in this case received no wages whatsoever.

Having received and accepted offers of employment from Defendants in their home towns in Mexico, contingent only on their being issued visas, these workers traveled, at their own expense, to the U.S. consulate in the Mexican border city of Matamoros, for many of them a journey of more than 12 hours and 600 miles. Once in Matamoros, they bore their own travel and lodging expenses, for a week, waiting for their visa appointments and for Defendants to send a bus to take them to Wisconsin. Then, only hours before they were scheduled to depart from Mexico to travel to Wisconsin, Defendants informed this group of workers that it no longer needed their services. The workers thus had to return to their home towns—again at their own expense—after having spent significant sums on travel and visa expenses, and without receiving a single day's wages from Defendants. Defendants never reimbursed the workers for their travel or visa expenses, and never compensated them for work offered and accepted. As a result, the majority of Class Members ended up unemployed, often having relinquished other jobs to work for Defendants, and saddled with significant debts, having borrowed funds to cover the travel expenses to work for Defendants.

Employment of migrant agricultural workers is highly regulated. Under federal law, one of the required terms that Defendants agreed to, as a condition of obtaining authorization to employ the Class Members in this case, was a promise to employ them for a defined term, rather than as at-will employees. 29 U.S.C. §1821(a)(4); *Reyes v. Remington Hybrid Seed Co., Inc.,* 495 F.3d 403, 406, n. 1 (7th Cir. 2007) (the AWPA "obliges" employers "to disclose 'the period of employment,'" meaning "the beginning and ending dates of work"); *Colon v. Casco, Inc.*, 716 F.

Case 1:12-cv-00210-WCG   Filed 02/20/15   Page 2 of 35   Document 67

Supp. 688, 694 (D. Mass. 1989) ("The 'period of employment' is a required term in every

working arrangement" under the federal Migrant and Seasonal Agricultural Worker Protect Act).

Like the federal government, the State of Wisconsin also requires employers to hire

migrant workers for a definite term, rather than at-will. Wisconsin also requires that that period

of employment must be memorialized by the employer in written disclosures, which must

contain a "minimum work guarantee," and must be provided to workers both at the time of

recruitment and at the time hiring. Wisc. Stat. § 103.915(4)(b); Wis. Admin. Code  DWD §

301.06(8).

The rationale for eliminating at-will employment for statutorily-protected migrant

agricultural workers under both state and federal law is clear: migrant agricultural workers often

leave families and other jobs, travel many hundreds of miles, and incur substantial out-of-pocket

visa and travel expenses to accept employment, making them vulnerable when employers

misrepresent or renege on agreed-upon terms and conditions of employment, on which the

workers relied. Both Congress and the state of Wisconsin have endeavored to protect these

workers against exactly the risk that materialized in this case. Class Members in this case were

victimized by a bait-and-switch. Defendants belatedly told them, only after that they had

accepted employment with GLK, left jobs and family, and incurred substantial expenses, that the

job was cancelled. The statutory guarantees provided by the AWPA, protecting against

terminations at-will and requiring written disclosure of the period of employment in writing

before workers agree to accept employment, are essential because migrant workers cannot

otherwise effectively insure against or mitigate this risk. *See Villalobos v. Vasquez-Campbell*,

1991 WL 311902 * 4 (W.D. Texas Nov. 15, 1991) ("Without the disclosure statements, farm

workers … are left without any written form of proof when employers misrepresent the terms

and conditions of employment. Many courts, in construing the AWPA and its predecessor, the

FLCRA, have recognized the critical role the disclosure statements serve ….").

In Count I of their Second Amended Complaint, Class Members claim that by stranding

them in Matamoros, after they had received and accepted offers of employment contingent only

on their being issued visas, and after they had in fact been issued those visas, Defendants

violated their rights under the Migrant and Seasonal Agricultural Worker Protection Act, 29

U.S.C. §§ 1801-1871 ("the AWPA"), which prohibits employers from breaching the "working

arrangement" they make with migrant agricultural workers. 29 U.S.C. § 1822(c). Class Members

allege that Defendants violated the working arrangement in two ways: (1) by failing to provide

them the work at the pay rate and for the period that Defendants certified in their Application for

Temporary Employment Certification; and (2) by failing to pay the workers for their costs of

return transportation from Matamoros to their homes, in violation of 8 U.S.C. § 1184(c)(5)(A)

and 20 C.F.R. § 655.22(m) (2009).[1] [2]

---

[1] Count I of the Second Amended Complaint asserts a variety of claims for violation of the AWPA. The claims for violation of the AWPA "working arrangement" are the subject of this motion and memorandum. The Class has filed a separate memorandum seeking partial summary judgment for violations of their rights under the AWPA arising from required disclosures that Defendants never provided them.

[2] Citations to the H-2B regulations are to the regulations implemented by the 2008 Final Rule, which was in effect from January 18, 2009 until 2012. *Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes; Final Rule*, 73 Fed. Reg. 78020 (Dec. 19, 2008) (codified at 20 C.F.R. § 655 Subpart A). Defendants noted in their Corrected Brief Opposing Plaintiffs' Motion for Rule 23 Class Certification (*Jimenez* Dkt. No. 81, p. 7) that, after the events that precipitated this case, the DOL issued further regulations on the H-2B program which were later enjoined and ultimately vacated. *See* Temporary Non-agricultural Employment of H-2B Aliens in the United States, 77 Fed. Reg. 10038 (Feb. 21, 2012) (codified at 20 C.F.R. § 655.18) ("2012 Final Rule"); *Bayou Lawn and Landscape Servs. v. Perez*, 2014 U.S. Dist. Lexis 180137 (N.D. Fla. 2014). The litigation surrounding the 2012 regulations has no impact on this case, as those regulations postdate Class Members' claims. Copies of the 2009 regulations cited herein are attached as Exhibit B.

4

In Count II of their Complaint, Class Members allege that by not employing them for the certified period of employment, GLK committed a common-law breach of their employment contract which was for a specific term.

On June 11, 2014, the Court certified Counts I and II for class-wide adjudication of liability issues. Dkt. No. 49. The Court defined the class as:

> All those individuals of who were recruited and hired by Defendants, received H-2B temporary work visas in August and September 2011 to work for the Defendants, and who were then dismissed, after being issued a visa but before traveling to Bear Creek, Wisconsin.

As demonstrated in this brief, the Class is entitled to summary judgment on the AWPA working arrangement and contract claims in Counts I and II because the material undisputed facts establish that:

(1)     Class Members entered into a valid contractual employment relationship with GLK.

(2)     Class Members' employment with GLK was governed and protected by the AWPA.

(3)     One of the required elements of every employment relationship under the AWPA is that employment of covered migrant workers must be employment for a term, rather than terminable at will.

(4)     By terminating Class Members' employment before the end of their contracted-for term, without legal justification, Defendants violated the AWPA.

(5)     By failing to reimburse Class Members for expenses they were required to incur for travel and visas after accepting GLK's offer of employment, Defendants violated the AWPA.

(6)     By failing to provide return transportation to the workers' points of origin, Defendants violated the AWPA.

(7)     Defendants' violations of the AWPA were intentional.

(8)     Defendants' actions likewise constituted breaches of contract at common law. And,

5

     (9)     The Class is therefore entitled to a liability judgment in its favor on Counts I and II for violations of the AWPA and for breach of contract.

## SUMMARY OF MATERIAL FACTS

Defendant GLK is the largest sauerkraut producer in the world, processing more than 120,000 tons of cabbage into sauerkraut annually. Plaintiff Classes' Consolidated Statement of Undisputed Facts ("PSUF") ¶ 1. GLK has revenues of between $50 million and $100 million annually. PSUF ¶ 1. At all relevant times, Defendant Ryan Downs was the owner and President of GLK. PSUF ¶ 2. As part of the process of producing sauerkraut, each head of raw cabbage must be cored and trimmed, individually, before fermenting. PSUF ¶ 3. The coring and trimming ("trim-line" work) is labor-intensive work. PSUF ¶ 3. It is also low-wage, seasonal work. At GLK it is performed primarily between August and November. PSUF ¶ 4. Every year, GLK hires roughly 50-100 seasonal workers to do the coring and trimming. PSUF ¶ 5. For a number of years, including all the years in the class period, GLK hired predominately Mexican nationals rather than U.S. workers to perform this "trim line" labor. PSUF ¶ 6. All Class Members were recruited and hired by Defendants to do "trim line" work at GLK's cannery plant in Bear Creek, Wisconsin under the federal government's H-2B program, 8 U.S.C. § 1101(a)(15)(H)(ii)(b). PSUF ¶¶ 4, 9. All Class Members received H-2B visas. PSUF ¶¶ 63-64. Defendants, however, chose not to bring them to Wisconsin, cancelled their visas, and stranded them at the U.S.-Mexico border. PSUF ¶¶ 66-67. Defendants did not pay Class Members any wages and did not reimburse them for any of the travel, immigration and other expenses they incurred in order to receive their visas. PSUF ¶¶ 68, 87-88.

All of the Class Members are migrant workers. PSUF ¶¶ 69-70. They are Mexican nationals whose permanent place of residence is Mexico. PSUF ¶¶ 69. Spanish is the primary

6

language of all Class Members, and the vast majority speak and read little-to-no English. PSUF 7, 69.

**Defendants' Participation in the H-2B Visa Program.**

The recruitment and employment of foreign nationals through "guest worker" visa programs is highly regulated and requires advanced authorization from the federal government.

Broadly speaking, the process for obtaining authorization to recruit and hire foreign H-2B workers proceeds in two-steps. At the first step, an employer must obtain a temporary labor certification from the U.S. Department of Labor ("DOL"), by filing an Application for Temporary Employment Certification (ETA 9142 Form). *See* 8 U.S.C. § 1101(a)(15)(H)(ii)(b); 20 C.F.R. § 655.22 (2009)[3]; 8 C.F.R. § 214.2(h)(6)(iii)(A). At the second step, if the DOL has a granted temporary labor certification, the employer petitions the Department of Homeland Security to issue H-2B visas, authorizing foreign workers to enter the United States. *See* 8 C.F.R. § 214.2(h)(6)(iii)(C), (E).

In 2011, as it had in several prior years, GLK completed this administrative certification process and received the requisite authorization to recruit and hire foreign workers. Based on the certifications made in the Application for Temporary Employment Certification (ETA 9142 Form) submitted to the DOL, GLK was granted permission for 143 H-2B workers. PSUF ¶ 194.

---

[3] Citations to the H-2B regulations are to the regulations implemented by the 2008 Final Rule, which was in effect from January 18, 2009 until 2012. *Labor Certification Process and Enforcement for Temporary Employment in Occupations Other Than Agriculture or Registered Nursing in the United States (H-2B Workers), and Other Technical Changes; Final Rule*, 73 Fed. Reg. 78020 (Dec. 19, 2008) (codified at 20 C.F.R. § 655 Subpart A). After the events that precipitated this case, the Department of Labor issued further regulations on the H-2B program which were later enjoined and ultimately vacated. *See* Temporary Non-agricultural Employment of H-2B Aliens in the United States, 77 Fed. Reg. 10038 (Feb. 21, 2012) (codified at 20 C.F.R. § 655.18) ("2012 Final Rule"); *Bayou Lawn and Landscape Servs. v. Perez*, 2014 U.S. Dist. Lexis 180137 (N.D. Fla. 2014). The litigation surrounding the 2012 regulations has no impact on this case, as those regulations postdate Class Members' claims.

7

In completing the ETA 9142 Form, GLK was required to certify, and did certify, under penalty of perjury, that foreign workers would be guaranteed certain mandatory terms and conditions of employment. PSUF ¶ 10, 12.

In completing the ETA Form 9142, every H-2B employer must identify the "Period of Intended Employment" for all H-2B workers that will be employed. PSUF ¶ 13. In GLK's ETA 9142 Form for the 2011 season, it represented that the "Begin Date" for employment for H-2B workers would be August 1, 2011 and the "End Date" November 15, 2011, for a total certified period of employment of 15 weeks and 2 days. PSUF ¶ 16. GLK further represented that "Our seasonal demand starts in August, when we require the labor to provide the products to our customers, through November." PSUF ¶ 17.

Every H-2B employer must also set forth the weekly hours of employment. GLK certified that the employment being offered was "full time" and that it involved "40 hours" a week of work. PSUF ¶ 18.

Satisfying a further prerequisite to employment of visa workers, GLK averred that it would comply with all Federal, State, and local employment-related laws and regulations, and that qualified U.S. workers were not available to perform the work. PSUF ¶ 10. GLK also certified that, if any H-2B worker's employment were terminated by GLK prior to the end of the certified period of employment, GLK would be liable for return transportation. PSUF ¶ 25.

**Defendants' Recruitment and Hiring of Class Members, and the Cost of Travel, Immigration and Recruitment.**

In 2011, Defendants recruited and hired approximately 135 migrant H-2B workers from Mexico as trim-line workers and placed all of their names on a list. PSUF ¶¶ 48, 52. Defendants divided the workers into three separate groups to have their visa interviews and then, if they were issued visas, board buses to travel to Wisconsin. PSUF ¶ 54. The first group departed the U.S.-

8

Mexico border on or about August 5, 2011 and arrived in Wisconsin on or about August 7, 2011. PSUF ¶ 55. The second group departed the U.S.-Mexico border on or about August 19, 2011 and arrived in Wisconsin on or about August 22, 2011. PSUF ¶ 55. Approximately 35 workers were in the third group. PSUF ¶ 56. Defendants made job offers to all the workers in the third group. PSUF ¶ 58. The offers were subject to a single condition: the State Department's issuance of H-2B visas. PSUF ¶ 61. All class members accepted these job offers. PSUF ¶ 62.

Because there was no U.S. consulate in or near Santiago Capitiro, where most class members reside, the workers recruited by Defendants from that area had to travel a considerable distance for visa interviews to Matamoros. PSUF ¶¶ 73-75.

The process of securing a visa and traveling to the border took several days. It also entailed significant expense. The items of expense typically included:

(a)     Bus fare from Santiago Capitiro to Matamoros;

(b)     Accommodations and meals in Matamoros for several days (and sometimes for longer), while visas are processed and the workers waited for GLK to schedule their travel date to Bear Creek;

(c)     Fees paid to a *licenciado,* to assist with visa paperwork;

(d)     Transportation between the hotel, the visa interview, and the office of the *licenciado*;

(e)     Visa application fees; and

(f)     Passport fees (for workers who didn't have a valid passport from an earlier season).

PSUF ¶ 76. The cost borne by each Class Member for these items ranged from approximately $300 to $900. PSUF ¶ 78. Some workers were also charged a recruitment fee of $1,000 U.S. or more, and were made to understand that they would not be hired by Defendants without paying this fee. PSUF ¶ 78.

9

Each Class Member traveled to Matamoros, incurred these costs (with the exception of a full visa application fee), and received a visa. PSUF ¶ 63-64, 66, 80. After receiving their visas, Class Members remained in Matamoros for several days while waiting for Defendants to arrange for transportation from Mexico to Wisconsin. PSUF ¶ 64. A bus was reserved to take this group to Wisconsin, PSUF ¶ 65, but on or about Sept. 1, 2011, GLK requested that the U.S. Consulate in Matamoros cancel all the Class Members' already-issued visas. PSUF ¶ 66. On approximately September 2, 2011, shortly before they were scheduled to depart Mexico to travel to Wisconsin, Defendants informed Class Members that their services were not needed. PSUF ¶ 67. Defendants did not provide or pay for Class Members' return transportation to their home towns, the cost of which totaled approximately $44 to $74 U.S. per worker. PSUF ¶ 68.

For most Class Members, these outlays amounted to more than a month's earning in Mexico, where their wages average $10 U.S. per day. PSUF ¶ 81. Many Class Members went into debt to raise money to cover these expenses, and many remain in debt to this day. PSUF ¶ 82. Many Class Members left their jobs in Mexico in order to work for GLK, and were unemployed for extended periods of time after returning from Matamoros. PSUF ¶ 82.

**<u>Defendants' Acknowledgment of Their Reimbursement Obligations.</u>**

In both 2010 and 2011, LaborQuest specifically advised Defendants, in writing, of their legal obligation to reimburse workers for recruitment, visa and travel expenses from their homes. PSUF ¶¶ 84-85. In fact, in 2010, Defendant Downs personally initialed a form provided to him by LaborQuest, agreeing to and acknowledging that:

> New H-2B regulations *require* employer[s] to pays [sic] (or reimburse) for *any* of the *recruitment, visa and travel expenses* for worker from their homes abroad to the place of employment.

(Emphasis added). PSUF ¶ 84. Similarly, GLK had certified in its ETA 9142 Form that, in compliance with the H-2B regulations, it would provide return transportation for workers

10

terminated early. PSUF ¶ 25. Disregarding these requirements, Defendants failed to reimburse Class Members for any of these expenses, or for the cost of their return transportation after Defendants cancelled their visas. PSUF ¶ 68, 88.

### **Defendants' Early Termination of Class Members and Cancellation of Their Visas Were Not Justified.**

Defendants claim they were justified in terminating all Class Members' employment, cancelling their visas, and stranding them at the U.S.-Mexico border due to the DOL's announcement of a new methodology for determining the mandatory minimum hourly wage payable to H-2B workers, under which the wages due to H-2B workers employed by GLK would have increased. PSUF ¶ 111.

Defendant Downs projected that the announced wage increase, which would have raised wages for trim-line workers in Bear Creek from $10.36 to $14.68 per hour, for an increase of $4.32 per hour, would have increased the company's the company's costs of labor for trim-line workers by $200,000. PSUF ¶ 121. GLK's total labor costs on an annual basis exceed $6.5 million. PSUF ¶ 122.

For several years leading up to 2011, it was well known that the DOL was planning changes to its methodology for setting wage rates for H-2B workers and that the result of those changes would be to raise wage rates. PSUF ¶¶ 112-116. These developments were so well known and so pervasive that, as early as November 2009, GLK's consultant on matters of H-2B employment, LaborQuest, specifically advised GLK to "Please keep in mind that if [the prevailing wage] is changed *at any time* during the process (or [even] when the workers are [already] in your employ) that you are *required* to adjust their wages accordingly." PSUF ¶ 117. In response, GLK wrote back to LaborQuest expressly confirming that:

11

> *We do understand* that any changes [to the prevailing wage rate governing wages for H-2B workers] are *our responsibility.*

PSUF ¶ 118. In addition, in January 2011, the DOL published a notice to the world in the Federal Register, explaining the wage increase and that its revised method would result in average hourly pay increases of $4.83 per hour for H-2B workers. PSUF ¶ 113. DOL also explained that a wage increase was necessary because existing wage rates for H-2B workers were "below what the average similarly employed worker is paid." PSUF ¶ 112. Indeed, DOL made a finding that that the existing wage rate methodology led to underpayment of wages in nearly 96% of cases. PSUF ¶ 112. Ultimately, however, the DOL's proposed wage increase never went into effect. PSUF ¶ 116, 119.

In 2011, after discharging those H-2B workers who were in Bear Creek, Defendants hired domestic workers to perform the trim-line work at a lower wage rate than the $10.36 an hour offered to and accepted by Class Members. PSUF ¶ 23, 127.

### Downs Was Personally Involved in the Recruitment and Hiring of Class Members, and in the Decision to Terminate Class Members, Cancel Their Visas, and Strand Them at the Border.

Defendant Downs exercised operational control over the recruitment, hiring and employment of H-2B workers. PSUF ¶¶ 31-32, 34, 38, 90-91, 120. He was personally involved with the H-2B application process, in some years personally signing temporary labor certification forms in which he agreed to follow federal and state labor and employment laws and initialed forms from GLK's labor contractors acknowledging an employer's legal obligations in the H-2B program. PSUF ¶ 11. Downs personally determined when, whether, and how many H-2B workers would be hired each season, PSUF ¶ 32, informed Jimenez Arroyo of the terms of employment that were to be communicated to the workers, PSUF ¶ 37, and monitored and supervised Jimenez Arroyo's recruitment efforts. PSUF ¶ 38. When the DWD and the DOL each

12

repeatedly investigated the treatment of migrant workers by GLK, Downs met with and/or spoke to the investigators. PSUF ¶ 136, 139, 147. Downs made the decision to terminate Class Members' employment, cancel their visas, and strand them at the U.S.-Mexico border. PSUF ¶ 91.

### **Required Disclosures Were Not Provided.**

The AWPA requires that migrant workers must be provided with detailed written disclosures in their native language regarding the terms and conditions of employment at the time of recruitment. 29 U.S.C. §§ 1821(a), (g). To facilitate compliance with these detailed disclosure requirements, the DOL publishes Form WH-518, which is a "Worker Information" sheet containing the disclosures required by the AWPA. PSUF ¶ 169.

Defendants did not make use of the DOL's form—or any alternative—in 2011. Defendants have stipulated that, other than the disclosures on their ETA 9142 Forms, which were not provided at the time of recruitment and were not in Spanish, PSUF ¶ 163, 164, 166, there were no other writings. PSUF ¶ 164-166. According to Defendants' stipulation, neither they, nor any agent working on their behalf, nor, to their knowledge any other person, ever provided any Class Member with written disclosures required by the AWPA. PSUF ¶¶ 163-66.

### **Defendants Had Notice of AWPA Requirements.**

In addition to Defendants' annual affirmative certifications in the ETA 9142 Forms that they would comply with all Federal, State, and local employment-related laws and regulations, PSUF ¶ 10, Defendants were repeatedly put on notice of the AWPA. PSUF ¶ 133-41. Defendant Downs received and reviewed informational brochures from the DWD and the DOL regarding applicable rules and regulations, and repeatedly discussed them with representatives of the agencies. PSUF ¶¶ 136, 156-57. Betty Miller, a human resources assistant at GLK who was

13

involved in the H-2B program, attended bi-annual DWD-sponsored programs regarding migrant workers, beginning in approximately 1999. PSUF ¶ 158. Those programs discussed the AWPA, including disclosure requirements. PSUF ¶ 159. Jacci Carlson, who became GLK's director of human resources in June 2011, read information on the DOL's website regarding laws related to H-2B workers. PSUF ¶ 160.

On multiple occasions, both the DOL and DWD investigated the treatment of H-2B and other migrant and seasonal workers by GLK. PSUF ¶ 133-55. Downs met with these investigators on behalf of GLK. PSUF ¶ 136, 139, 147. In 2002, GLK was cited and fined by the DOL for violations of the AWPA disclosure requirements from 2000 through 2002, and assessed a civil monetary penalty of $4,503.68. PSUF ¶ 134. In 2008, DOL again investigated GLK for, among other things, failure to provide the required recruitment disclosures to migrant and seasonal workers from 2006 through 2008. PSUF ¶ 137. Defendant Downs and Miller participated in a conference with the investigator and claimed "that they were not aware of some of the MSPA [AWPA] requirements and, now that they were, would comply." PSUF ¶ 140. The DOL also found that GLK had violated the H-2B regulations in 2010 and 2011, and assessed a total of $21,000 in civil penalties against GLK, which GLK paid in early 2013. PSUF ¶ 144-48. Downs and Carlson participated in a conference with the investigator on September 6, 2012. PSUF ¶ 147.

In spite of GLK's lengthy history of being subject to investigations by the DOL and the DWD, and the fact that the company had paid $21,000 in civil penalties to the DOL for its violations of the H-2B regulations less than six months before the signed discovery responses in this case, Defendants provided false sworn discovery responses in this case, dishonestly denying

and concealing that they had ever been investigated by any of these agencies for violations of the AWPA, the WMLA, or the H-2B regulations. PSUF ¶ 162.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Fleishman v. Continental Cas. Co.,* 698 F.3d 598, 603 (7th Cir. 2012). Only factual disputes that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247–48 (1986).

## ARGUMENT

Defendants made an offer of employment to every Class Member, which every Class Member accepted. PSUF ¶ 58, 62. Defendants promised future compensation and, in exchange, Class Members promised to perform future services. An enforceable "working arrangement" under the AWPA was thereby formed. So, too, was a contract of employment, at common law. Under the AWPA, that contract was for a definite term, rather than at-will and, accordingly, when Defendants terminated each Class Member's employment before the end of the contracted-for term, they both violated the AWPA and committed an actionable breach of contract. The material facts are undisputed. The Class is entitled to Summary Judgment on Counts I and II of the Second Amended Complaint.

## I.     MEMBERS OF THE CLASS ENTERED INTO A VALID CONTRACTUAL EMPLOYMENT RELATIONSIHIP WITH GLK.

Defendants made an offer of employment to every Class Member, which every Class Member accepted. PSUF ¶ 58, 62; *see Piaskoski & Assocs. v. Ricciardi*, 686 N.W.2d 675, 679 (Wis. Ct. App. 2004) (under Wisconsin common law, offer and acceptance exist when the parties mutually express assent, and consideration exists if the parties manifest an intent to be bound to

15

the contract). Defendants promised future compensation and, in exchange, Class Members promised to perform future services. The formation of a binding employment relationship in this manner, by the exchange of promises, is common in the employment context: an employer offers a job and the employee accepts it, with the expectation that performance will begin at a later time, which may or may not be proximate to the time of acceptance; and in the interim, both parties are bound and wish to be bound so that the employee can leave a job, suspend his or her search and the employer can conclude its recruitment efforts.[4] That is what occurred here.

Defendants made job offers, and Class Members both indicated their acceptance and commenced partial, initial performance—by leaving their home towns to travel to Matamoros for visa processing, often giving up a job to do that, incurring (for them) very substantial expenses, completing visa paperwork, sitting for a visa interview, and ultimately by receiving a visa. *See* PSUF ¶ 53, 62, 64, 73, 78, 80. By these acts, an enforceable contract was formed. *See Gould v. Artisoft, Inc.*, 1 F.3d 544, 549-50 (7th Cir. 1993) (Employee's promise to sign noncompetition agreement and to relocate in exchange for employer's promise of employment created an enforceable contract, even where the employee had not yet taken action to fulfill his promises when his employment was terminated); *Flower v. T.R.A. Indus., Inc.*, 127 Wash. App. 13, 27, 111 P.3d 1192, 1199 (2005) ("Mr. Flower promised to accept the position at Huntwood, sell his house, and move to Washington, while Mr. Hunt promised to terminate their relationship only for good cause. The exchange of these two promises formed a bilateral contract"); *see also*

---

[4] Where the offer and acceptance merely create an at-will employment relationship, the intent to be bound, of course, can effectively be revoked by the employer or the employee at any time, without penalty. However, as explained in the rest of this memorandum, the protections of the AWPA displace at-will employment, rendering GLK's promise of a job binding, absent a cognizable justification for excusing it. Under the AWPA, a defined period of employment is a required element of every working arrangement. *See Reyes v. Remington Hybrid Seed Co., Inc.,* 495 F.3d 403, 406 (7th Cir. 2007); *Colon v. Casco, Inc.*, 716 F. Supp. 688, 694 (D. Mass. 1989).

16

*Ferraro v. Koelsch*, 124 Wis. 2d 154, 164 (1985) ("It is black letter law that a promise for a promise, or the exchange of promises, will constitute consideration . . . ."); *Ohanian v. Avis Rent A Car Sys., Inc.*, 779 F.2d 101, 109 (2d Cir. 1985) (contract for employment terminable only for "just cause" was sufficiently definite to be enforceable, where adequate consideration was given of employee's relocation from San Francisco to New York); *Cresswell v. Bausch & Lomb, Inc.*, No. 85 C 5822, 1986 WL 13528, at *4 (N.D. Ill. Nov. 21, 1986) (noting that sufficient consideration would exist to support promise for employment where plaintiff was recruited to leave his place of employment to accept the offer with employer and promised to relocate).[5]

Thereafter, both sides contemplated that the sole condition to completing full mutual performance was the State Department's agreement to issue visas. PSUF ¶ 61. And that condition was fulfilled when the State Department in fact approved and printed visas for Class Members. PSUF ¶ 64.[6]  At that point, Defendants could not repudiate the contract without committing a breach. When they did repudiate it, rescinding their agreement to provide jobs after the State Department printed visas, that conduct gave rise to a meritorious claim for total breach of contract.

## II.    CLASS MEMBERS' EMPLOYMENT WITH GLK WAS GOVERNED AND PROTECTED BY THE AWPA.

The Class Members in this case were recruited and hired by Defendants to work as "migrant agricultural workers" within the meaning of the AWPA.

The AWPA was passed in 1982, in substantial part to strengthen and expand protections for migrant and seasonal agricultural workers, who have "long been among the most exploited

---

[5] Pursuant to Civil Local Rule 7(j)(2), copies of all unpublished opinions, decisions, and orders cited herein are attached as Exhibit A.

[6] Further, under Fed. R. Civ. Proc. 9(c), any denial that conditions precedent have occurred must be made "specifically and with particularity." Defendants' answer to the complaint contains no such denial.

17

groups in the American labor force." S. Rep. No. 93-1295, reprinted in 1974 U.S.C.C.A.N. 6441, 6441-42; 29 U.S.C. § 1801. The decision to strengthen and expand protections reflected Congress' awareness that existing protections—under the Farm Labor Contractor Registration Act ("FLCRA"), 7 U.S.C. § 2041 *et seq.* (repealed 1983)—had "failed to reverse the pattern of abuse and exploitation of migrant and seasonal farmworkers." 1982 U.S.C.C.A.N. 4549*; see also,* H.R. Rep. No. 97–885, 2d Sess. 16, reprinted in U.S.C.C.A.N. 4547, 4550 (1982) (noting the failures of the FLCRA and emphasizing the "desperate[ ] need" for redoubled efforts to enforce the protections originally embodied in the FLCRA); *id.* ("[e]vidence ... confirms that migrant and seasonal agricultural workers remain today, as in the past, the most abused of all workers in the United States"); *Morante-Navarro v. T&Y Pine Straw, Inc.,* 350 F.3d 1163, 1169 (11th Cir. 2003); *Barajas v. Bermudez,* 43 F.3d 1251, 1254 (9th Cir. 1994).

The AWPA is a remedial statute, generally to be construed broadly to effectuate its humanitarian purposes. *Charles v. Burton*, 169 F.3d 1322, 1334 (11th Cir. 1999) (*citing Caro-Galvan v. Curtis Richardson, Inc.*, 993 F.2d 1500, 1505 (11th Cir. 1993). Among its protections, the AWPA requires an employer to disclose basic terms of any employment offered to a migrant worker and abide by those terms. 29 U.S.C. § 1821(a); 29 U.S.C. § 1822(c).

The AWPA defines a "migrant agricultural worker" as "an[y] individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A). "Agricultural employment" is, in turn, also broadly defined, and specifically includes:

> … the handling, planting, drying, packing, packaging, processing, freezing, or grading prior to delivery for storage of any agricultural or horticultural commodity in its unmanufactured state.

18

29 C.F.R. § 500.20. *See also De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 236 (7th Cir. 1983) (cannery workers are engaged in "agricultural" employment; construing the Farm Labor Contractor Registration Act, predecessor to the AWPA).

Class Members in this case fit within all prongs of the AWPA's definition of a "migrant agricultural worker." They were migrant workers—from Mexico. And they were recruited and hired for "agricultural" employment—to handle and process cabbage in its unmanufactured state. PSUF ¶¶ 4-9. They were therefore entitled to the protections provided by the AWPA.

GLK and Defendant Downs were each "employers" under the AWPA. 29 C.F.R. § 500.20(d). GLK's status as an employer is admitted. Defendant Downs' status as a statutory employer for purposes of the AWPA is established by his retention of the powers to make hiring, firing and wage-setting decisions, Dkt. No. 78 ¶ 9, as well as by his exercise of those powers. PSUF ¶¶ 31-32, 130. Downs, for example, was personally responsible for the decision to terminate workers' employment before the end of their contractual period of employment. PSUF ¶ 130.

The protections of the AWPA commence at the time of recruitment and not, merely, on the first day on the job. 29 U.S.C. § 1821(a) ("at the time of the worker's recruitment"); *Montelongo v. Meese*, 803 F.2d 1341, 1348 (5th Cir. 1986) (applying FLCRA to uphold a cause of action on behalf domestic workers who were recruited and hired but then informed the "deal was off," after H-2 visa workers became available).

19

**III.    AS REQUIRED BY THE AWPA, THE EMPLOYMENT RELATIONSHIP BETWEEN DEFENDANTS AND THE CLASS WAS FOR EMPLOYMENT FOR A DEFINITE TERM, RATHER THAN TERMINABLE AT WILL.**

**A.    Under The AWPA, The Employment Relationship Between Migrant Workers And Their Employers Is Governed By A Statutorily-Required Written "Work Arrangement."**

The terms and conditions of employment between AWPA-covered employers and AWPA-protected workers are governed by what the AWPA refers to as the "working arrangement" between an employer and its migrant agricultural workers. 29 U.S.C. §§ 1822 and 1832; 29 C.F.R. §500.72.

The starting point for every "working arrangement" are the terms and conditions stated in the statutorily-required, written disclosures that employers must make to workers at the time of recruitment, 29 U.S.C. § 1821(a); *De Leon-Granados*, 581 F. Supp. 2d at 1317, including specification of the "wage rates to be paid," "the period of employment," and "the transportation, housing, and any other employee benefit to be provided, if any, and any costs to be charged for each of them." 29 U.S.C. § 1821(a). These mandatory terms, which must be stated in those required disclosures, are thereafter incorporated into and become required elements of every AWPA "working arrangement," which becomes a "'statutory contract' for agricultural workers." *De Leon-Granados*, 581 F. Supp. at 1317. An "employer's failure to comply the terms from the required written disclosures provided at the time of recruitment gives rise to a breach of the AWPA." *Id.* (quoting *Villalobos v. Vasquez-Campbell*, No. EP–89–CA–27, 1991 WL 311902, at *7 (W.D. Tex. Nov. 15, 1991)).[7]

---

[7] Required terms of AWPA or WMLA employment, as specified in the disclosure requirements in 29 U.S.C. § 1821(a) and Wis. Stat. 103.915(4)(a), may create an enforceable AWPA "working arrangement" or WMLA "work agreement" even where common-law requirements for contract formation might not otherwise be satisfied.

At the same time, and as a matter of law, every AWPA working arrangement *also* implicitly incorporates federal and state employment laws and regulations in effect at the time of contracting. *See De Leon-Granados*, 581 F. Supp. 2d at 1316-17 (noting that the AWPA itself is not the only "source" for obligations imposed by an AWPA, because it also incorporates both obligations specified in an employer's application for H-2B certification and those "required under another statute or regulation," and that "failure to pay wages required under another statute or regulation is a violation of the AWPA, even if the other statute provides no private right of action."); *Medrano v. D'Arrigo Bros. Co. of Cal.*, 125 F. Supp.2d 1163, 1166-67 (N.D. Cal. 2000) (employer's obligation may arise from express provisions of the AWPA itself or from state law incorporated by the AWPA); *see also Donaldson v. U.S. Dept. of Labor*, 930 F.2d 339, 350 (4th Cir. 1991); *Fulford v. Alligator River Farms, LLC*, 858 F. Supp. 2d 550, 556-57 (E.D.N.C. 2012); *see generally, Home Bldg. & Loan Assn. v. Blaisdell*, 290 U.S. 398, 429-30 (1934) ("the laws which subsist at the time and place of the making of [the] contract, and where it is performed, enter into and form a part of it, as if they were expressly referred to or incorporated in its terms.")

Under the AWPA, an employer may not violate any of the terms of the working arrangement without justification, and any such breach is a violation of the Act. 29 U.S.C. § 1822(c) ("[N]o farm labor contractor, agricultural employer, or agricultural association, shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker.")

**B.  In Every AWPA "Working Arrangement," Employment For A Defined Period or Term Is A Required Element.**

One of the required elements in every AWPA working arrangement is a defined "period of employment," 29 U.S.C, § 1821(a)(4), specifying beginning and ending dates of work. *See*

21

*Reyes v. Remington Hybrid Seed Co., Inc.,* 495 F.3d 403, 406, n. 1 (7th Cir. 2007) (the AWPA "obliges" employers "to disclose 'the period of employment,'" meaning "the beginning and ending dates of work"); *Colon v. Casco, Inc.*, 716 F. Supp. 688, 694 (D. Mass. 1989) ("The 'period of employment' is a required term in every working arrangement.")

The AWPA displaces at-will employment, substituting in its place a guarantee of employment for a defined period, which constitutes a required element of every employment relationship under the AWPA.

### C. The Working Arrangement Between Class Members And Defendants Was For Employment For A Term: From August 9 To November 30 For the 2011 Season.

Having established that the APWA requires employment of migrant workers for a term, displacing employment at will, the next question, in this case, is how long the required term of employment was. That question is answered by the application (ETA 9142 Form) that Defendants submitted to the DOL as a condition and prerequisite to obtaining authorization to import foreign workers. In applying for this authorization, GLK certified that the positions it was seeking to fill were "full-time" positions; that wages would be paid at or above the federally-mandated prevailing wage rate; and that the "Begin Date" for intended employment was August 1, 2011 and the "End Date" was November 15, 2011. PSUF ¶ 16. These were required disclosures on the ETA 9142 Form. Defendants could not have obtained authorization to import foreign workers without them. 20 C.F.R. § 655.20 (2009).[8]

The Defendants have stipulated that, but for the above disclosures on their ETA 9142 Form, there were no other writings. PSUF ¶¶ 163-67. According to their stipulation, neither

---

[8] GLK's ETA 9142 Form also certified that if GLK terminated any workers' employment prior to the end of the certified period, GLK would be liable for the worker's return transportation to Mexico. PSUF ¶ 25. Agreement to this requirement was mandatory. *See* 8 U.S.C. § 1184(c)(5)(A); 20 C.F.R. § 655.22(m) (2009).

they, nor any agent working on their behalf, nor, to their knowledge any other person, ever provided any Class Member with written disclosures required by the AWPA. PSUF ¶ 163.

The AWPA *requires* written disclosure of the term or period of employment, which, as a matter of law, then becomes a required element and enforceable term of the employment relationship. Because written disclosure of the period of employment is required, and by their own admission the only written disclosure Defendants ever made of the period of employment was in the ETA 9142 Form they submitted to the United States Department of Labor, the "Begin Date" and "End Date" stated in that form became terms of the AWPA working arrangement as a matter of law. *See Donaldson v. U.S. Dep't of Labor*, 930 F.2d 339, 349-50 (4th Cir. 1991) (terms of employment submitted to Department of Labor by employer of AWPA-covered workers are incorporated into the AWPA "working arrangement"); *De Leon-Granados v. Eller & Sons Trees, Inc.,* 581 F. Supp. 2d 1295, 1325 (N.D. Ga. 2008) (holding that terms of employment submitted to Department of Labor by employer of AWPA-covered workers were incorporated into the workers' working arrangements. "); *Frederick Cnty. Fruit Growers Ass'n, Inc. v. McLaughlin*, 703 F. Supp. 1021, 1030-31 (D.D.C. 1989) *aff'd sub nom, Frederick Cnty. Fruit Growers Ass'n, Inc. v. Martin*, 968 F.2d 1265 (D.C. Cir. 1992) (same). *See also Fulford v. Alligator River Farms, LLC,* 858 F. Supp. 2d 550, 556-57 (E.D.N.C. 2012) (AWPA working arrangement also incorporates protections guaranteed by H-2A regulations).

## IV. DEFENDANTS VIOLATED THE AWPA BY TERMINATING CLASS MEMBERS PRIOR TO THE END OF THE CONTRACTED-FOR EMPLOYMENT PERIOD, BY FAILING TO REIMBURSE WORKERS FOR EXPENSES THEY WERE REQUIRED TO INCUR FOR VISAS AND TRAVEL UPON ACCEPTING GLK'S OFFER OF EMPLOYMENT, AND BY REFUSING TO PAY FOR THEIR RETURN TRANSPORTATION.

Defendants violated the AWPA working arrangement in a number of ways.

First, they failed to employ Class Members for the entire contracted-for period, instead terminating them without legal justification after they had accepted employment and obtained visas, but before they could depart for Wisconsin. PSUF ¶¶ 62, 64-67.

Second, Defendants violated the AWPA by failing to reimburse Class Members for expenses they were required to incur for travel and visas after accepting GLK's offer of employment. PSUF ¶¶ 78-79.

Third, Defendants violated the AWPA by failing to pay Class Members' return transportation to their homes after they were terminated. PSUF ¶ 68.

## V.    DEFENDANTS' VIOLATIONS OF THE AWPA WERE INTENTIONAL.

Under 29 U.S.C. § 1854(c)(1), "intentional" violations of the AWPA entitle a migrant agricultural worker to recover statutory damages. There is no requirement of scienter or specific intent. Under the AWPA, "intentionally" means that a defendant was consciously or deliberately engaged in the action that led to the violation, even if the defendant was unaware that it was violating the law. *De La Fuente*, 713 F.2d 225 at 238 (applying FLCRA; *see also Fanette v. Steven Davis Farms, LLC*, 28 F. Supp. 3d 1243, 1262 (N.D. Fla. 2014) (AWPA "employs the common civil standard which holds one liable for the natural and foreseeable consequences of one's acts"); *Montalvo v. Larchmont Farms, Inc.*, No. CIV.06-2704(RBK/AMD), 2009 WL 4573279, at *14 (D.N.J. Dec. 3, 2009). "This means that the focus is not on the defendant's knowledge of the statute, but the deliberateness of his actions." *Montalvo,* 2009 WL 4573279, at *14. And neither an employer's ignorance of the law nor its mistaken belief that it was not subject to the AWPA can excuse its violations. *De La Fuente*, 713 F.2d at 238 (defendants' erroneous belief that it was except from the FLCRA's requirements did not make its violation unintentional); *Salazar-Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1345 (5th Cir. 1985) (rejecting argument that defendant could not have committed an intentional violation

24

of FLCRA absent knowledge of the statute's existence and requirements); *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 632 (W.D. Tex. 1999); *Bueno v. Mattner*, 633 F. Supp. 1446, 1466 (W.D. Mich. 1986) (rejecting same argument regarding AWPA).

Further, in cases where violations occur as part of a defendant's normal business practices, no further showing of intent is required. *Fanette*, 28 F. Supp. 3d at 1262-63; *Osias v. Marc*, 700 F. Supp. 842, 844 (D. Md. 1988).

In this case, Defendants' made conscious and deliberate decisions to cancel Class Members' visas, terminate their employment, not to reimburse Class Members' for their expenses, and not to cover their transportation back to their hometowns. The visas were not cancelled or the employment terminated "inadvertently." These actions were purposeful and intended. That alone is sufficient to establish intentional violations of the AWPA.

## VI. NO COGNIZABLE JUSTIFICATION OR DEFENSE EXISTS FOR DEFENDANTS' VIOLATIONS OF THE AWPA.

The AWPA allows for the possibility of an affirmative defense to breaches of a working arrangement or work agreement, in the rare event that performance would have been impossible or seriously impracticable. The AWPA defines this defense in terms of "justification," by providing that:

> The [AWPA] prohibits farm labor contractors, agricultural employers and agricultural associations from violating, *without justification*, the terms of any working arrangements they have made with migrant or seasonal agricultural workers. Normally, "without justification" would not include situations in which failure to comply with the terms of any working arrangements was directly attributable to acts of God, due to conditions beyond the control of the person or to conditions which he could not reasonably foresee.

29 C.F.R. § 500.72(a) (emphasis added).

No "justification" defense should be allowed here because GLK has not raised the alleged presence of justification as an affirmative defense. Dkt. No. 41 (Answer to Second Amended Complaint). "If a defendant does not raise [affirmative] defenses at the time of filing

25

an answer, those defenses are deemed waived." *Castro v. Chic. Housing Authority,* 360 F.3d

721, 735 (7th Cir. 2004); *Operating Engineers Local 139 Health Benefit Fund v. Lake States

Indus. Servs., Inc.,* No. 05-C-0020, 2005 WL 1563332, at *2 (E.D. Wis. June 30, 2005).

However, on the merits, the defense also fails and fails as a matter of law. The

circumstances that led to Class Members' early terminations were not entirely "beyond"

Defendants' "control." Under the circumstances present here, there is no legal justification for

shifting the entire risk and cost of the announced and then aborted wage increase in 2011 onto

the backs of low-wage workers or for allowing Defendants to escape their contract.

**A.     There Is No Legal Justification For Shifting The Entire Risk And Cost Of
          The Announced And Then Retracted Wage Increase In 2011 To The Low-
          Wage Workers Rather Than The Employer.**

GLK claims that the cause of its termination of Class Members' employment was what

Defendant Downs referred to as the "Socialist Wage Department's" announcement of an increase

in the prevailing wage rate applicable to H-2B workers. PSUF ¶ 193. There are at least four

reasons why the DOL's announcement did *not* provide a cognizable justification under the

AWPA, and the incorporated WMLA, for discharging class members in this case before the end

of their guaranteed period of employment in 2011.

First, an increase in the cost of performance is rarely allowed as a defense to contractual

performance.[9] Market shifts affecting the price of raw materials or labor are common

---

[9] Notably, the increase in the cost of performance would have increased GLK's total labor costs by less than 3%. Downs projected that the announced wage increase, which would have raised wages for trim-line workers in Bear Creek from $10.36 to $14.68 per hour, for an increase of $4.32 per hour, would have increased the company's the company's costs of labor for trim line workers by $200,000. PSUF ¶ 121. GLK's total labor costs on an annual basis exceed $6.5 million. PSUF ¶ 122. Accordingly, a $200,000 increase as a result of the DOL's new rule, had it been implemented, would have increased the company's total labor costs by less than 3%. The company has of revenues of $50 million to $100 million annually; by that measure, the increase would have been less than four-tenths of a percent of overall revenues. ($200,000/$50,000,000 = .004). If the DOL's proposed rule had been implemented, the increase for GLK, at $4.32 an hour,

26

occurrences. Although their timing often cannot be predicted, the risk of their occurrence is known. As a result, they are rarely the sort of risk that an employer could not protect against either through insurance or appropriate contractual language, nor so insurmountable an obstacle as to excuse performance. Further, "[i]t does not matter [if] it is an act of government" that triggers the increase in costs. *N. Ind. Public Serv. Co. v. Carbon County Coal Co.*, 799 F.2d 265, 278 (7th Cir. 1986). As the Seventh Circuit has emphasized, in this very context, government regulation is "a pervasive factor" in the economy and, consequently, allowing changes in the regulatory environment to excuse contractual performance would make contracts unstable. *Id.*; *see also, W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber, Cork, Linoleum & Plastic Workers of Am.*, 461 U.S. 757, 768 n.12 (1983) ("Economic necessity is not recognized as a commercial impracticability defense to a breach of contract claim."); *Neal-Cooper Grain Co. v. Texas Gulf Sulphur Co.*, 508 F.2d 283, 293-94 (7th Cir. 1974) ("The fact that performance has become economically burdensome or unattractive is not sufficient for performance to be excused. In our opinion, the present case is one in which performance may have become burdensome but was not excused. Performance . . . was not shown to have been impossible . . . . [In addition], [t]he red flag of possible governmental controls [was] discernible."); *Ashraf v. Swire Pac. Holdings, Inc.*, 752 F. Supp. 2d 1266, 1270 (S.D. Fla. 2009) (change is market conditions is ordinarily not sufficient to excuse contract performance); *Seaboard Lumber Co. v. United States*, 41 Fed. Cl. 401, 416 (1998) (government policies which do not prevent performance but merely make performance unprofitable are not sufficient grounds to prevent a party from being held liable for non-performance; otherwise, "a financially unstable

---

would have been 11% less than the $4.83 average per hour bump that DOL had projected for H-2B employers overall. *See* PSUF ¶ 124.

party would be able to enter into risky contracts with impunity, knowing that if luck went against it, it would be excused from performance. This is not the law.").[10]

Second, in this case, Defendants were not blind-sided by the announcement of a wage increase. For several years leading up to 2011 there had been strong indications that the DOL was planning action to reconfigure its method for determining prevailing wage rates for H-2B workers, specifically in order to increasing H-2B wage rates. PSUF ¶¶112-18. The risk was so well known, and the rumors so pervasive, that in November 2009, GLK's consultant on matters of H-2B employment, LaborQuest, specifically advised GLK to "[p]lease keep in mind that if [the prevailing wage] is changed *at any time* during the process (or [even] when the workers are [already] in your employ) that you are *required* to adjust their wages accordingly." PSUF ¶ 117. Acknowledging that, GLK wrote back to LaborQuest expressly assuming that risk, stating that:

> "*We do understand* that any changes [to the prevailing wage rate governing wages for H-2B workers] are *our responsibility*."

PSUF ¶ 118. GLK was specifically advised of the risk of a wage increase and voluntarily chose to bear it. *See E. Air Lines, Inc. v. Gulf Oil Corp.*, 415 F. Supp. 429, 433 (S.D. Fla. 1975) (impracticability not an available defense where "the handwriting was on the wall").

---

[10] Because an increase in costs does not excuse contract performance at common law, it absolutely should not excuse it under the AWPA. Absent contrary evidence, and there is none here, the court must presume that Congress intended the "justification" exception in the AWPA to be consistent with, rather than alter, the scope of established contract defenses in existing law. *See Hall v. United States*, 132 S. Ct. 1882, 1889 (2012) ("We assume that Congress is aware of existing law when it passes legislation");*Miles v. Apex Marine Corp.,* 498 U.S. 19, 32, (1990); *State v. Olson*, 175 Wis. 2d 628, 641, 498 N.W.2d 661, 666 (1993) ("When determining legislative intent, this court must assume that the legislature knew the law in effect at the time of its actions."); *Kindy v. Hayes*, 44 Wis. 2d 301, 314, 171 N.W.2d 324, 330 (1969) (finding that it is presumed that legislature acted with full knowledge of existing law, both statutes and court decisions interpreting it, and that presumption extends to and includes rule of administrative agency).

28

Third, the *announcement* of a planned wage increase, turned out to be only that—an announcement. In the end, the wage increase did not materialize: on September 28, 2011, the DOL postponed the effective date of the rule until Nov. 30, 2011. As of today, three years later, a new wage rule still has not taken effect. *See* Wage Methodology for the Temporary Non-Agricultural Employment H-2B Program; Delay of Effective Date, 78 Fed. Reg. 53643 (August 30, 2013) (indefinitely delaying implementation of wage determination rule at 20 C.F.R. § 655). But even if the wage increase *had* gone through, that would *not*, without more, have created a cognizable defense to contract performance. Rather, the question then would have become whether the employer or employees should bear the risk and incur the resulting loss.

As things currently stand, Defendants have shifted the *entire* risk and cost to the H-2B workers. That is inconsistent with contract law. In the *rare* situations where contract law allows a party to avoid performance due to changed circumstances, that defense is upheld, as the Seventh Circuit has explained, in order to further the goal of "shifting risk to the party better able to bear it, either because he is in a better position to prevent the risk from materializing or because he can better reduce the disutility of the risk (as by insuring) if the risk does occur." *N. Ind. Public Serv. Com.*, 799 F.2d at 278. Here, no such purpose is furthered by allowing Defendants to unilaterally abrogate their contract with workers and avoid their end of the bargain by cutting the contract short and sending the workers back to Mexico, placing the entire risk of increased costs onto the workers. Defendants were far better positioned than the workers to take out insurance against the risk of changes in the cost of materials or labor. There is no market for such insurance available to rural Mexican workers. Defendants also had superior information about this risk— indeed, had been specifically warned by LaborQuest about it and, in the face of that warning, voluntarily assumed the risk.

Fourth, after discharging class members, Defendants replaced them with domestic workers whom they hired at a lower wage rate. PSUF ¶¶126-27. That means of "covering" in the market was blatantly illegal. Once an employer has filed and received approval to import H-2B workers, under no conditions can it pay domestic workers less favorable wages for the same work. *See* 20 C.F.R. § 655.10(b) ("The employer must offer [the prevailing wage] or higher to both its H-2B workers and any similarly employed U.S. worker hired in response to the recruitment required as part of the application."). The purpose of H-2B wage requirements is to protect the wage levels of domestic workers—to assure that employers bring H-2B workers into the country *only* when the wages and working conditions of similarly U.S. workers will not be adversely affected. *See United Ass'n of Journeymen and Apprentices of Plumbing & Pipe Fitting Indus., AFL-CIO v. Reno,* 73 F.3d 1134, 1136 (D.C. Cir. 1996); *De Leon-Granados,* 581 F. Supp. 2d at 1317.

Here, Defendants perversely turned the program purpose upside down. They replaced foreign visa workers with domestic workers *in order to* pay the domestic workers *less* for the same work. That was blatantly illegal. The wage rate mandated by the Department of Labor for H-2B workers is a floor not a ceiling on the wages that must be paid to foreign workers *and* similarly employed U.S. workers. It would be a manifest miscarriage of justice, unjustly enriching Defendants, to allow them to *profit* from their decision to replace visa workers with domestic workers, whom they *illegally* paid *less* after having represented to the government that they were unable to even find domestic workers to perform the work needed. PSUF ¶¶ 126-27. Equities are important when a defendant seeks to escape and refuse to perform a contract.

## VII. THE CLASS IS ALSO ENTITLED TO JUDGMENT IN ITS FAVOR ON COUNT II, FOR BREACH OF CONTRACT.

By hiring and employing Class Members, the Defendants indisputably entered into employment contracts with them. *See Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 57 (1st Cir. 2013) ("[A]n employer-employee relationship is, at heart, a contractual one. … The defendants, by hiring and employing the plaintiffs, entered into [ ] employment contract[s] with them. There is no requirement of greater formality to establish an employment contract. Indeed, 'an informal contract of employment may arise by the simple act of handing a job applicant a shovel and providing a workplace.'") (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 74 (1984).

Further, under the AWPA, an element of any contractual relationship between a migrant worker and a covered employer (i.e., the work arrangement) is a defined and disclosed period of employment, rather than employment terminable at-will. *See* Sections II and III, *supra*. Additional elements of that contractual relationship are wage payments at the prevailing wage, including in the first week, and reimbursement for the costs of workers' return transportation home, if terminated before the end of the contracted-for period of employment. There is no factual dispute that Defendants breached these terms of Class Members' employment contracts.

Indeed, under basic contract principles, AWPA requirements became implied terms of the contractual relationship between Defendants and every Class Member as a matter of law. *See Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991) ("Laws which subsist at the time and place of the making of a contract, and where it is to be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.") (internal quotation omitted); *Dairyland Greyhound Park, Inc. v. Doyle*, 295 Wis. 2d 1,

31

48-49 (Wis. 2006) (stating that laws in effect at the time of a contract are deemed part of an offer and any resulting contract).

In sum, the employment relationship between Defendants and Class Members was contractual, and an implied term of that contract was employment for a fixed term, rather than employment at-will. Defendants breached the contract they had with each Class Member by terminating Class Members' employment before the end of the contracted-for term.

Separately and in addition, Defendants violated the contractual duty of good faith and fair dealing by causing the cancellation of Class Members' visas. The duty of good faith and fair dealing "accompanies every contract." *In re Chayka's Estate*, 47 Wis. 2d 102, 108 & n.7 (1970); Restatement (Second) of Contracts § 205. And, at its most basic, the duty of good faith and fair dealing imposes an obligation on contracting parties not to prevent or hinder performance of their contract.[11] This provides an independent basis for their liability for breach of contract.

Under the doctrine of good faith and fair dealing, Defendants were obligated to refrain from positive actions preventing approval of visas by the State Department. *See, e.g., Vanadium Corp v. Fidelity & Deposit Co.,* 159 F.2d 105, 108 (2d Cir. 1947) (where contract performance was subject to approval by the Secretary of the Interior, there was a clear obligation to attempt in good faith to secure that approval and to refrain from positive action to prevent it); *In re President Casinos, In*c., 419 B.R. 381, 390-92 (E.D. Mo. 2009) (and cases cited therein) (a

---

[11] *See* Restatement (Second) of Contracts § 245 (1981), comment a ("Where a duty of one party is subject to the occurrence of a condition, the additional duty of good faith and fair dealing … may require some cooperation on his part, either by refraining from conduct that will prevent or hinder the occurrence of that condition or by taking affirmative steps to cause its occurrence … [and] non-performance of that duty when performance is due is a breach."); *id.*, Illustrations 1, 3 and 4. *See also* Farnsworth, Contracts § 8.6 at 544–45 (3d ed.1999) ("The duty of good faith and fair dealing that is usually imposed requires at least that a party do nothing to prevent the occurrence of a condition of that party's duty.").

breaching party cannot avoid liability where, to the extent continued performance required government licensing or approvals, its own conduct blocked that licensing or approval).

This means, at a minimum, that Defendants had to refrain from positive conduct blocking the issuance of visas. Acting utterly inconsistent with that duty, they affirmatively procured the cancellation of those visas. PSUF ¶ 66. When GLK offered employment and Class Members accepted employment, it was not the parties' intent that GLK would reserve the power to rescind or revoke that agreement by taking unilateral action to prevent the issuance or procure the cancellation of visas.

## CONCLUSION

For all the reasons stated above, Class Members request entry of the judgment for liability only in their favor on Counts I[12] and II of the Second Amended Complaint for Defendants' failure to employ Class Members for the full-term of promised employment without justification, for Defendants' failure to pay Class Members the prevailing wage for 40 hours or more of work per week, and for Defendants' failure to cover the cost of return transportation for Class Members all in violation of the AWPA's working arrangement (Count I) and breach of contract (Count II).

Dated: February 20, 2015

s/ Joshua Karsh
One of Class Members' Attorneys

---

[12] Except for the disclosure claim in Count I, which is addressed in a separate motion and memorandum seeking summary judgment as to liability and damages.

Matthew J. Piers
Joshua Karsh
José J. Behar
Claudia Flores
Jenna Miara
Attorneys for Class Members
Hughes Socol Piers Resnick & Dym, Ltd.
70 W. Madison Street, Suite 4000
Chicago, IL 60602
Telephone: (312) 580-0100
Fax: (312) 580-1994
E-mail:    mpiers@hsplegal.com
               jkarsh@hsplegal.com
               jbehar@hsplegal.com
               cflores@hsplegal.com
               jmiara@hsplegal.com

Ali Beydoun
Attorney for Class Members
Farmworker Justice
1126 16th Street, N.W., Suite 270
Washington, D.C. 20036
(202) 293-5420 ext. 308
E-mail: abeydoun@farmworkerjustice.org

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing document will be served on counsel listed below by CM/ECF on February 20, 2015.

Michael Aldana, Esq.
Quarles & Brady LLP
411 East Wisconsin Avenue, Suite 2040
Milwaukee, WI 53202
Michael.Aldana@quarles.com

<u>s/ Joshua Karsh</u>
One of Plaintiffs' Attorneys