UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ALEJANDRO JURADO JIMENEZ et al.,

Plaintiffs,

v.                                                          Case No. 12-CV-209

GLK FOODS LLC and RYAN A. DOWNS,

Defendants.

AND

JOSE ENRIQUEZ RAMIREZ et al.,

Plaintiffs,

v.                                                          Case No. 12-CV-210

GLK FOODS LLC and RYAN A. DOWNS,

Defendants.

## CONSOLIDATED DECISION AND ORDER ON
## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

These related class actions arise out of the recruitment and employment of Mexican migrant

workers as "trim-line laborers" to process raw cabbage into sauerkraut at a facility owned by

Defendant GLK Foods, LLC, in Bear Creek, Wisconsin. Defendant Ryan Downs is an owner and

president of GLK. Over the years, GLK applied for and was granted authorization to employ the

workers under the federal government's "H-2B" guest-worker visa program. *See* 8 U.S.C.

§ 1101(a)(15)(H)(ii)(b). Alexandro Jurado Jimenez et al. brought Case No. 12-cv-209 (hereinafter

"the Jimenez case") on behalf of approximately 210 migrant workers who worked at the cannery

during one or more of the 2006 through 2011 late summer/early fall seasons, with the exception of 2009 when GLK missed the deadline for its application for authorization to import H-2B workers. Jose Enriquez Ramirez et al. brought Case No. 12-cv-210 ("the Ramirez case") on behalf of approximately 35 other H-2B workers who were recruited by GLK in 2011, but then not provided jobs after they had incurred the expenses of obtaining visas and traveling to the Mexican-United States border for transportation to the job site. The cases are before the Court on various motions for partial summary judgment.

In a previous decision, the Court granted in part the motion for summary judgment of the Plaintiffs in the Jimenez case on their claim that Defendants violated the Fair Labors Standards Act (FLSA), 29 U.S.C. §§ 201–219, by failing to reimburse certain travel expenses, visa fees and border crossing expenses to the extent necessary to prevent the first week wages of the 2010 and 2011 workers from falling below the federal minimum wage. (ECF No. 119.)[1] The Plaintiffs in both cases (collectively "Plaintiffs") and the Defendants ("GLK") have now filed cross motions for summary judgment on several of the remaining claims, which arise under the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. §§ 1801–1871, the Wisconsin Migrant Labor Act (WMLA), Wis. Stat. §§ 103.90–.97, Wisconsin's wage payment and living wage laws,[2] and the State's common law governing contract. This Decision and Order will address all pending motions in these two cases. For the reasons that follow, Plaintiffs' motions will be granted in part and denied in part, and GLK's motions will be denied.

---

[1]Unless otherwise indicated, record citations correspond to the docket numbers in the Jimenez case.

[2]Plaintiffs' "living wage" law claim arises under Wis. Stat. § 104.02 before it was prospectively amended by 2015 Wis. Act. 55.

2

# I. BACKGROUND

GLK is the largest producer of sauerkraut in the world. (Pls.' Consolidated Statement of Undisputed Facts (PSUF) ¶ 1, ECF No. 117.) Defendant Ryan Downs was an owner and the president of GLK at all times relevant to these cases. GLK is a family-owned, agriculturally-dependent business that processes more than 120,000 tons of raw cabbage into sauerkraut annually and sells its product under brand names including Cortland Valley, Silver Floss, and Krrrrisp Kraut, among others. (Ryan A. Downs Dep. Tr. 34:22–23, ECF No. 117-3.) GLK has operations in the state of New York and in Bear Creek, Wisconsin. This case involves workers hired at GLK's sauerkraut cannery plant in Bear Creek, Wisconsin.

At the Bear Creek plant, raw cabbage grown at GLK farms and elsewhere is dumped by trucks into a yard. After field waste is separated out, each individual head of cabbage is "cored" using a machine operated by an individual person. The heads of cabbage are then fed from the coring machines into a cleaner that sprays high-pressure water and tumbles the cabbage to remove outer leaves and dirt. The cabbage is then inspected and trimmed before being shredded into coleslaw, salted and put in vats for fermentation. (Downs Dep. Tr. 6–10.) This cutting and coring work is known as "trim-line" labor.

GLK requires trim-line laborers during the "cutting season" of the sauerkraut production process. Although the cutting season generally takes place from August to November, the beginning of a given season is a function of when farmers are able to harvest their cabbage crops in a particular year, based largely on weather conditions, and the end date is a function of how much cabbage the harvest yields.

3

Historically, GLK has employed migrant workers from Mexico as trim-line laborers. According to Downs, this is because it is difficult to find quality local workers who do not already have full-time employment. (*Id.* at 11:19–20.) By the 1990s, GLK was hiring many of its trim-line laborers from a small Mexican village called Santiago Capitiro in the state of Guanajuato. This occurred through the recruiting efforts of Rafael Jimenez Arroyo, a full-time GLK employee who was originally from that village. Arroyo has worked at GLK since 1992 and has proved to be a reliable worker. Downs also describes GLK's arrangement with workers from Arroyo's hometown as "a matter of reliability": "You knew that you had a source of workers and that you could count on them. Plus, Rafael had a lot of his cousins and whatnot from his village who had come. We got to know them well. They came, many, year after year. It was comfortable for both parties." (*Id.* at 17:10–16.) Although Arroyo handled official recruiting activities, in the late 1990s and early 2000s Downs also traveled to Santiago Capitiro, sometimes bringing his family, both for a vacation and to get to know his workers.

In order to bring trim-line laborers from Santiago Capitiro to Bear Creek, Wisconsin, GLK was required to comply with the H-2B program, the temporary work visa program for non-agricultural workers which grew out of the Immigration Reform and Control Act of 1986 (IRCA), 8 U.S.C. § 1101(a)(15)(H)(ii)(a)–(b). H-2 visas are granted to temporary workers from foreign countries to supplement the domestic labor market. *See* Mathes, Charles C., *The Department of Labor's Changing Policies Toward the H-2B Temporary Worker Program: Primarily for the Benefit of Nobody*, 80 FORDHAM L. REV. 1801, 1807–808 (2012) (hereinafter Mathes). The essential purpose of the H-2 program is "to permit employers to utilize temporary foreign workers if U.S. workers could not be found and if the use of such workers would not adversely affect the

4

wages or working conditions of similarly employed domestic workers." Mathes at 1807. The IRCA divided the H-2 visa into two separate categories: the H-2A visa for temporary agricultural workers and the H-2B visa for temporary non-agriculture workers.[3] In enacting the IRCA, Congress provided greater protection to H-2A workers because it viewed them as more susceptible to exploitation. Mathes at 1807–08.

In order to participate in the H-2B program, the employer must file a prevailing wage request with the DOL.[4] The DOL then makes a prevailing wage determination (PWD) for the particular job position the employer needs filled. The employer is then required to advertise the position to all potential workers at a wage at least equal to the PWD. 20 C.F.R. § 655.10. If insufficient U.S. workers apply, the employer then files an Application for Temporary Employment Certification with the DOL. (ECF No. 87-3, 4.) If after complying with all of the regulatory requirements, the DOL is satisfied that there are insufficient U.S. workers qualified for the H-2B position, the DOL certifies the employer's need for foreign workers for the period requested. The employer then petitions U.S. Citizenship and Immigration Services within the Department of Homeland Security to grant the visa application. Mathes at 1809–10. If the petition is granted, the employers either directly or through local recruitment agencies begin the process of recruiting the workers in their home countries.

Although GLK recruited workers directly through Arroyo's actions, GLK also contracted with employment agencies specializing in the H-2B program to assist with submitting its H-2B

---

[3] The definition of "agricultural worker" for purposes of the H-2 visa program is narrower than the definition under the AWPA and the WMLA. Thus, while the Plaintiffs where granted H-2B visas as non-agriculture workers, they fall within the coverage of both the AWPA and the WMLA.

[4] Though some of the regulations governing the process have changed over the last several years, this was the process that existed at the time GLK participated in the program.

5

petition to the U.S. Department of Labor, helping workers obtain temporary work visas, and transporting workers from Mexico to Wisconsin. GLK hired 75, 74, and 90 trim-line laborers through the H-2B program in 2006, 2007, and 2008, respectively. (PSUF ¶¶ 40–42.) Exactly what these workers were told prior to beginning their employment in Wisconsin is not clear from the record. Downs testified that Arroyo was given "a set of rules he had to abide by regarding disclosure of work conditions, wages, all of the things that the federal and state government require of us." (Downs Dep. Tr. 19:10–13.) However, Arroyo himself testified (through an interpreter) that at one point in time he was overseeing GLK's recruiting in Mexico by telephone and without even leaving Wisconsin. (Rafael Jimenez Arroyo Dep. Tr. 46–47, ECF No. 117-7.) Additionally, even when he personally traveled to Santiago Capitiro, it is not clear what Arroyo told workers. He testified that he told prospective workers "[w]hen the season was going to start more or less and when it would end" (*id.* 41:12–13) (he could not know the exact dates at the time of his recruiting trips in the spring because they would depend on weather and growing conditions), and he also testified that he did not always provide complete information to recruits because many had been coming to GLK to work for years and knew the arrangement. (*Id.* 42.)

In any event, it is stipulated for purposes of summary judgment in these cases that neither GLK, nor any agent working on its behalf, provided H-2B workers hired in 2006–2008, or 2010 or 2011 with written disclosures of terms of employment or with written employment contracts as required by the AWPA and the WMLA. (Defs.' Resp. to PSUF ¶ 163, ECF No. 126.) Notwithstanding these infractions, discussed in more detail below, GLK's arrangement with the workers from Santiago Capitiro appears to have remained mutually beneficial at least until 2010 and 2011. As noted above, many of the same workers had been coming to Wisconsin to work GLK's

6

cutting season for years. And although it missed the deadline to import foreign workers in 2009, GLK returned to Mexico to recruit H-2B workers in 2010.

GLK received authorization to hire 110 and 143 H-2B workers in 2010 and 2011 respectively. (*See* 2010 & 2011 Applications for Temporary Employment Certification, Exs. 8 & 9 to PSUF, ECF Nos. 117-8 & 117-9.) In these years, as had become his practice, Arroyo maintained a list of prospective workers from Santiago Capitiro. Although some details regarding this list are not clear or are in dispute,[5] it is not disputed for present purposes that Arroyo or someone else at GLK placed the names of all workers who had been offered and accepted employment for 2010 and 2011 on the list. (Defs.' Resp. to PSUF ¶¶ 51–52.) GLK offered these workers employment subject to the condition that they obtain visas. Those who accepted were given instructions for obtaining H-2B visas. Visa appointments were scheduled for workers at the U.S. consulate in Mexico City in 2010 and the border city of Matamoros in 2011. GLK does not dispute that its understanding and the workers' understandings were that upon issuance of a visa to any worker in these years, the trim-line laborer job was his. (*Id.* ¶ 53.) From GLK's perspective, receipt of a visa constituted acceptance of the job offer. (*Id.* ¶ 62.)

In order to obtain these visas, workers in 2010 and 2011 paid their expenses for travel from their homes in Santiago Capitiro to the U.S. Consulate in Mexico City (193 miles) and/or Matamoros (600 miles), fees to a "*licenciado*" for help with visa paperwork, visa application fees,

---

[5]For example, Plaintiffs allege and GLK disputes that Arroyo charged some workers "recruiting fees" of $1,000 or more for access to his list of prospective workers.

7

and other expenses.[6]  They then traveled to Matamoros where, upon payment of a fee, they crossed the border and boarded buses provided by GLK for the trip to Bear Creek, Wisconsin.

GLK recruited and hired 86 and 135 H-2B workers in 2010 and 2011 respectively.  (PSUF ¶¶ 46, 48.)  Except for 43 workers whose visas would be cancelled before departing from Mexico in 2011, all of these workers traveled to Wisconsin to work.  While the workers were in Bear Creek, it is undisputed that GLK issued payroll checks based upon the applicable prevailing wage for all hours they worked.  GLK also provided room and board for the workers, payment for which it deducted from their paychecks.

In both 2010 and 2011, GLK terminated the workers' employment after eight weeks of work or less, and transported them back to the border.  In its Applications for Temporary Employment Certification, GLK had indicated a "Period of Intended Employment" from August 9 to November 30 in 2010 and from August 1 to November 15 in 2011.  (Exs. 8 & 9 to PSUF.)  Each application was certified by DOL for a "validity period" corresponding to these dates.  The 2010 application was certified in May and the 2011 application was certified in June.  In addition to the "Period of Intended Employment," and other information about GLK's job offer and about GLK's unsuccessful efforts to recruit U.S employees, the Applications required GLK to certify a number of conditions of employment.  One such condition stated: "During the period of employment that is the subject of the labor certification application, the employer will comply with applicable Federal, State and local employment-related laws and regulations, including employment-related health and safety laws."  (Exs. 8 & 9 at B.1.)  Another condition provided that "Unless the H-2B worker is being sponsored

---

[6]GLK disputes only that workers incurred "visa fees."  According to GLK, it paid fees to the H-2B agency with which it had contracted, LaborQuest, and LaborQuest paid workers' visa fees.  (Defs.' Statement of Proposed Material Facts ¶ 15, ECF No. 111.)

8

by another subsequent employer, the employer will inform H-2B workers of the requirement that they leave the U.S. at the end of the period certified by the Department or separation from the employer, whichever is earlier, as required under [20 C.F.R. § 655.35], and that if dismissed by the employer prior to the end of the period, the employer is liable for return transportation." (Exs. 8 & 9 at B.2.)

Prior to the arrival of the 2010 workers at GLK's Bear Creek facility, northeast Wisconsin experienced major rains. Flooding in Outagamie County had caused an outbreak of black rot that decimated GLK's cabbage crop. The ultimate yield in 2010 was 20% of what GLK had planned for. (Defs.' Statement of Proposed Material Facts (DSPMF) ¶ 24, ECF No. 111.) The damage to the crop was known to GLK by at least the end of July, and perhaps earlier. (PSUF ¶ 104.) With what was left of the crop dying, GLK hired temporary trim-line laborers from the United States to try to salvage what it could. (Downs Dep. Tr. 49–50.) According to Downs, the crop "was rotting so fast that I think in late July—which is the earliest we ever started—we [hired temps] to try to salvage something out of some of the fields." (*Id.* at 49:25–50:3.) With the validity period of the H-2B workers approaching, GLK initially decided to bring up only about half of the 86 workers who had obtained visas in that year. That decision was later reversed, and GLK brought up all of the workers by about August 17. (PSUF ¶¶ 92, 106.) Ultimately, however, there was not enough work to keep the workers employed for a normal August-to-November cutting season. About half of the workers were sent home on September 16, and the remaining workers' last day of work was October 26. (PSUF ¶¶ 93–94.) GLK provided return transportation for these workers to Laredo, Texas on the U.S.–Mexico border, but not from the border to Santiago Capitiro. These workers were paid the prevailing wage certified in the Application for Temporary Employment Certification of $7.85, but

9

the workers received no compensation for the portion of the "validity period" that they did not work, and GLK never reimbursed these employees for any of the pre-employment expenses they had incurred.

The 135 H-2B workers who obtained visas in 2011 were scheduled to depart Mexico around August 5. One group left Mexico on that date, and a second left Mexico around August 19. A third group of 35 workers never left Mexico. GLK does not dispute that these workers had obtained visas and accepted GLK's offer of employment. (Defs.' Resp. to PSUF ¶¶ 58–59.) The prevailing wage certified in the 2011 Application was $10.36, which was a rate increase GLK learned about upon receiving the DOL's certification in June. (DSPMF ¶ 32.) Around the time GLK was transporting the first two groups of workers to Wisconsin, however, DOL notified GLK that the prevailing wage applicable to the 2011 workers would be increased again, this time to $14.68, which was an 87% increase from the previous year. (*Id.*) After unsuccessfully appealing the wage increase and faced with another disappointing harvest of only 70% of plan, GLK determined it was no longer economically viable to employ H-2B workers. (*Id.* ¶¶ 32–33.) On September 1, 2011, GLK asked the U.S. Consulate in Mexico to cancel the visas for the workers who had not yet departed and sent word to the workers that their services would not be needed the following day. (PSUF ¶¶ 66–67.) The workers who had been brought up were all sent home by September 28. (*Id.* ¶ 97.) GLK provided return transportation for these workers to Laredo and it paid them $10.36 for the hours they did work. It did not provide transportation all the way home for these workers or for the ones whose visas had been cancelled, and it did not reimburse any of these workers for their pre-employment expenses. The $14.68 wage increase never went into effect.

10

## II. ANALYSIS

Plaintiffs seek summary judgment as to liability and damages[7] on their claims that GLK failed to disclose terms of employment as required under the AWPA and WMLA in 2006, 2007, 2008, 2010, and 2011, failed to provide work agreements as required under the WMLA in the same years, took unauthorized deductions from workers' paychecks in violation of the WMLA in 2011, and failed to make and keep records of workers' permanent addresses in violation of the AWPA in 2011. (ECF No. 113.)[8]

Plaintiffs also seek summary judgment as to liability only on their claims alleging GLK failed to employ the 2010 and 2011 workers for the promised term of employment, failed to pay the same workers a prevailing wage, and failed to provide the workers return transportation to their homes in Mexico, all in violation of the AWPA, WMLA, breach of contract, and Wisconsin's living wage law. (ECF No. 115; No. 12-cv-210, ECF No. 66.)[9] GLK seeks summary judgment in its favor on the AWPA, breach of contract and living wage claims arising out of its early termination of the 2010

---

[7]The Court has previously granted Plaintiffs' motions for class certification in each case. (ECF No. 84; Case No. 12-cv-210, ECF No. 49.) After class certification in the Ramirez case, Plaintiffs filed a motion to modify slightly the scope of the certification such that the class was certified for purposes of liability <u>and damages</u> thereby conforming to the earlier certification of the corresponding claims in the Jimenez case. (No. 12-cv-210, ECF No. 56.) The motion is unopposed and it is hereby granted.

[8]These claims are alleged in the Second Amended Complaint in the Jimenez case in Count IV (AWPA disclosure), Count V (AWPA record-keeping), and Count VII (WMLA disclosure, work agreement, and deductions), and in the Second Amended Complaint in the Ramirez case in Count I (AWPA disclosure).

[9]These claims are alleged in the Jimenez case in Count III (AWPA), Count VI (breach of contract), Count VII (WMLA), and Count VIII (living wage), and in the Ramirez case in Count I (AWPA) and Count II (breach of contract).

11

and 2011 workers' employment and the alleged failure to pay a prevailing wage. (ECF No. 109; Case No. 12-cv-210, ECF No. 60.)

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette,* 359 F.3d 925, 928 (7th Cir. 2004).

## A. Statutory Framework

### 1. AWPA

The AWPA was enacted in 1983 with the express purpose "to assure necessary protections for migrant and seasonal agricultural workers, agricultural associations, and agricultural employers." 29 U.S.C. § 1801. Like its predecessor, the Farm Labor Contractor Registration Act (FLCRA), the AWPA is a remedial statute and thus must be broadly construed to effectuate its purpose. *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1325 (11th Cir. 2008) ("We have recognized that AWPA is a remedial statute and should be construed broadly to effect its humanitarian purpose."); *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 234 (7th Cir. 1983) ("We note as an initial matter that FLCRA is a remedial statute and should be construed broadly.").

The AWPA requires any "agricultural employer" who recruits any "migrant agricultural worker" to disclose in writing the terms of employment, including, *inter alia*, the place of employment, wage rates to be paid, and the "period of employment," at the time of recruitment. 29 U.S.C. § 1821(a). The written disclosure must be in a language understood by the recruited worker.

12

29 U.S.C. § 1821(g). The obvious purpose of this provision is to make sure, to the extent possible, that the workers will have "complete information about where they are going and what the conditions will be when they arrive, before they begin the journey." H.R. Rep. (Education and Labor Committee) No. 97-885, 97th Cong., 2nd Sess., *reprinted in*, 1982 U.S.C.C.A.N. 4547, 4560.

The AWPA also requires an agricultural employer who employs any migrant agricultural worker to "pay the wages owed to such worker when due" and prohibits the employer from violating "the terms of any working arrangement" made by the employer with the worker "without justification." 29 U.S.C. § 1822(a), (c). Agricultural employers must make, keep and preserve for three years records showing, *inter alia*, the basis on which wages were paid, the number of hour worked, the total earnings, the specific sums withheld and why, and the net pay for each worker. 29 U.S.C. § 1821(d). DOL regulations additionally require the agricultural employer to make and keep a record of each migrant worker's permanent address. 29 C.F.R. § 500.80(a).

### 2. WMLA

The WMLA was enacted in 1977 with the intent of improving the status of migrant workers in the State. Laws of 1977, Ch. 17, § 1. Like the AWPA, the WMLA requires any person who recruits migrant workers for employment in the State to provide each worker with a written disclosure of the terms and conditions of the offered employment in a language understood by the worker. The WMLA also requires employers of migrant workers to provide each worker with a written "work agreement" in a language understood by the worker at the time of hiring. Wis. Stat. § 103.915(1)(a) & (b). The "work agreement" must include "a statement of the place of employment, kind of work available, applicable wage rates, pay period, approximate hours of employment including overtime applicable, term of employment including approximate beginning and

13

ending dates, kind of housing and any charges in connection therewith, cost of meals if provided by employer, transportation arrangements, the names of all persons in the family employed if a family is employed and any other charges or deductions from wages beyond those required by law." Wis. Stat. § 103.915(4)(a).

The "work agreement" required under the WMLA must also include "a guarantee of a minimum of 20 hours of work in a one-week period or a minimum of 64 hours of work in a 2-week period" over the entire period of employment "from the date the worker is notified by the employer to report for work, which date shall be reasonably related to the approximate beginning date specified in the work agreement, or the date the worker reports for work, whichever is later, and continuing until the final termination of employment, as specified in the work agreement, or earlier if the worker is terminated for cause or due to seriously adverse circumstances beyond the employer's control." Wis. Stat. § 103.915(4)(b). In the event a migrant worker reports for work as notified by an employer, but is never employed due to "seriously adverse circumstances beyond the employer's control," the WMLA nevertheless requires that employer to pay the worker wages at the offered rate of pay from the time of the worker's point of departure from home or elsewhere to his return, but in no event "not less than 3 nor more than six days' pay at 8 hours per day." Wis. Stat. § 103.915(5). The Wisconsin Department of Workforce Development (DWD) makes standard form contracts available for use by employers, or employers may use a different form if approved by DWD. *Id.* § 103.915(2).

14

## B. Violations of Disclosure, Work Agreement, Record Keeping, and Wage Deduction Requirements of the APWA and WMLA

There is no dispute that GLK and the H-2B workers it hired for work at GLK's Bear Creek cannery are covered by the AWPA and the WMLA. *See* 29 U.S.C. § 1802(2), (3) & (8); Wis. Stat. § 103.90(5)(a). As noted above, Plaintiffs argue they are entitled to summary judgment that GLK violated these provisions when it (1) failed to disclose terms of employment in 2006, 2007, 2008, 2010, and 2011, (2) failed to provide work agreements in the same years, (3) took unauthorized deductions in 2011, and (4) failed to make and keep records of workers' permanent addresses in 2011.

GLK has stipulated to most of the facts underlying these claims. GLK does not dispute that it failed to provide written disclosures of work terms or work agreements to any workers, and that it failed to make and keep records of the permanent addresses of the named plaintiffs in Jimenez. (Defs.' Resp. to PSUF, ECF No. 121, ¶¶ 163, 191.) Accordingly, with respect to liability on the first second, and fourth claims above, there is no genuine dispute of fact and Plaintiffs are entitled to judgment as a matter of law.

GLK does contend, however, that factual issues preclude summary judgment on Plaintiffs' claim that GLK took unauthorized housing deductions from the 2011 workers' paychecks. GLK points to several "seasonal personal data sheets" submitted by Plaintiffs in support of their motion and notes that several of these forms have the handwritten notation "75.00" next to a check mark indicating housing would be provided by GLK. (*E.g.*, SPDS for Marcelino Sifuentes Guerrero, Ex. Group. 96 to PSUF, ECF No. 117-102 at 6.) Based on these notations, GLK argues there is an issue of fact as to whether workers provided *knowing* authorizations. GLK contends summary

15

judgment is therefore not appropriate because these documents suggest that at least some of the workers did authorize the deductions in writing.

The existence of the notation "$75" on some of the workers' "seasonal personal data sheets" does not constitute the required written authorization for the deductions. At most, the notations show only that some of the workers may have known GLK was deducting $75 per week from their paychecks for housing, not that they authorized the deduction. The employee's signature on the form attests only that he "physically resided in the State of Wisconsin for ten (10) months or more," which of course was factually untrue. (*Id.*) GLK's practice in 2011 stands in sharp contrast to what was done in earlier years when GLK had obtained the workers' explicit written authorization to take deductions for room and board in separate, unequivocal forms. (*See* Ex. Group 95, ECF No. 117-101.) Thus, it is clear as a matter of law that GLK violated the WMLA when it took deductions from 2011 Class members paychecks for food and lodging without first obtaining their written authorization.

In sum, GLK violated both the AWPA and the WLMA when it failed to provide written disclosures of the terms of the employment it was offering. GLK additionally violated the AWPA by failing to make and keep accurate records of the permanent addresses of the individual workers. GLK additionally violated the WMLA by failing to provide the workers with work agreements and by deducting food and lodging expenses from the 2011 workers' paychecks without written authorization.

Both the AWPA and the WMLA provide for statutory damages/penalties for each violation. The AWPA provides:

16

> If the court finds that the respondent has intentionally violated any provision of this chapter or any regulation under this chapter, it may award damages up to and including an amount equal to the amount of actual damages, or statutory damages of up to $500 per plaintiff per violation, or other equitable relief, except that (A) multiple infractions of a single provision of this chapter or of regulations under this chapter shall constitute only one violation for purposes of determining the amount of statutory damages due a plaintiff; and (B) if such complaint is certified as a class action, the court shall award no more than the lesser of up to $500 per plaintiff per violation, or up to $500,000 or other equitable relief.

29 U.S.C. § 1854(c)(1). The WMLA provides, subject to an exception not applicable here:

> [I]f any person violates ss. 103.90 to 103.97, or fails or refuses to obey any lawful order of the department or any judgment of any court in connection with ss. 103.90 to 103.97, for each such violation, failure or refusal, such person shall forfeit not less than $10 nor more than $100. Each day of continued violation shall constitute a separate offense.

Wis. Stat. § 103.97(1)(a).

With respect to damages and/or penalties for these violations, Plaintiffs request a penalty "with bite." They offer several reasons in support of their request: (1) GLK has been the subject of repeated investigations and enforcement actions by the DOL and DWD in the past; (2) GLK falsely denied the existence of these enforcement actions or investigations in sworn discovery responses in this litigation; (3) GLK's non-disclosure violations were not slight omissions, but failures that strike at the heart of workers' rights under the AWPA and WMLA; and (4) the value of the dollar has eroded since the AWPA and WMLA established the statutory amounts in 1983 and 1971, respectively.

In light of these factors, Plaintiffs request the an award of $500 per worker per season for the non-disclosures under the AWPA, totaling $230,000 for the five years at issue, and $500 per worker for the failure to keep records of the individual Jimenez Plaintiffs' permanent addresses under the AWPA, totaling $95,000 for the five years. (Pls.' Combined Br. 28, ECF No. 114.) Plaintiffs

17

request $100 per worker per paycheck subject to unlawful deductions under the WMLA, totaling $49,600. (*Id.* at 30.) Finally, Plaintiffs request $100 per worker per day worked without the written disclosures under the WMLA, and $100 per worker per day worked without a written working agreement under the WMLA. Although Plaintiffs do not know exactly how many days the workers worked each year, there were 75 workers in 2006 estimated to have worked 43–47 days, 74 workers in 2007 estimated to have worked 50–51 days, 90 workers in 2008 estimated to have worked 77–84 days, 86 workers in 2010 estimated to have worked 22–24 days, and 92 workers in 2011 estimated to have worked between 20–37 days. (*Id.* at 29 & 30 n.16.) Taking the low end of the range, the award for these WMLA violations would total $3,517,400 ($200 x 75 x 43 + $200 x 74 x 50 + $200 x 90 x 77 + $200 x 86 x 22 + $200 x 92 x 20). In sum, the foregoing awards would approach $4,000,000 ($230,000 + $95,000 + $3,517,400 + $49,600 = $3,892,000), and that is not including damages for AWPA and WMLA violations discussed in the next section, nor double damages for FLSA violations found in the Court's previous order.

In response, GLK argues that Plaintiffs' motion for summary judgment as to damages should be denied because issues of fact remain "as to the appropriateness of a penalty." (Defs.' Opp. Br. at 24, ECF No. 125.)[10] GLK first argues the violations are of a technical nature and Plaintiffs have failed to show how they were harmed by any violations. GLK also argues the violations were not intentional. Neither argument is persuasive.

Congress and the Wisconsin legislature thought the requirements important enough to authorize statutory damages—i.e., to authorize recovery without the need to show actual harm. "It

---

[10]The entirety of GLK's argument regarding Plaintiffs' request for summary judgment as to liability and damages on these claims appears on pages 23–25 of GLK's opposition brief filed in the Jimenez case. (ECF No. 125.)

is recognized that one of the harms that the AWPA is designed to combat is the plight of migrant workers who, by the nature of their work, travel long distances and stand at the mercy of employers who may attempt to renege on the offer of employment or vary the terms or conditions of that offer." *Herrera v. Singh*, 103 F. Supp. 2d 1244, 1249 (E.D. Wash. 2000). This would appear to be just the type of harm suffered by the workers sent home early in the 2010 and 2011 seasons. Requiring employers to obtain written authorization for paycheck deductions and to keep and maintain records also further the important goal of protecting migrant workers from exploitation.

On the question of intent, it is true that a finding that the violation is intentional is a prerequisite to statutory damages under the AWPA. No such finding, however, is required under the WMLA. Moreover, even as to the AWPA, the undisputed facts of the case establish that GLK's violations were intentional. The term "intentionally," as used in the AWPA, "means conscious or deliberate and does not require a specific intent to violate the law." *De La Fuente*, 713 F.2d at 238 (interpreting "intentional" in the context of the Farm Labor Contractor Registration Act (FLCRA), which is the predecessor to AWPA); *Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217, 1224 (7th Cir. 1981) (same); *Bueno v. Mattner*, 829 F.2d 1380, 1385 (6th Cir.1987); *Alvarez v. Longboy*, 697 F.2d 1333, 1338 (9th Cir.1983). The requirement that damages be awarded only for violations shown to be "intentional" has been construed liberally to impose liability on individuals for the natural consequences of their acts. *Rivera v. Adams Packing Ass'n*, 707 F.2d 1278, 1283 (11th Cir.1983).

Here, there is no real dispute that GLK's failure to provide the written disclosure required by the AWPA and its failure to make and keep accurate records of the workers' permanent addresses was conscious and deliberate. Indeed, in light of the facts that GLK's personnel regularly attended programs at which the AWPA and WMLA requirements were addressed, that it received

19

informational brochures regarding the applicable rules and regulations, and that it had been previously investigated, cited and fined for failing to comply with these laws, one could even find that GLK intended to violate the law or was at least reckless in doing so.

For all of these reasons, the Court concludes that Plaintiffs are entitled to summary judgment on liability on these claims and that statutory damages are warranted. The record is not sufficient at this time, however, to allow the Court to determine the amount of the damages/penalty that should be awarded. The provisions at issue authorize a wide range of allowable statutory damages and provide the Court with discretion in assessing an appropriate amount within that range. Moreover, damages and/or penalties are available under both the AWPA and the WMLA for the same conduct. At this time, with little idea of the amount of damages to which Plaintiffs will be entitled for their other claims, including the 2010 and 2011 workers' FLSA claims for double damages, as well as the claims discussed below, it would be premature to render any determination on an amount of statutory damages. In addition, the AWPA's damages provision expressly authorizes the court to consider whether an attempt was made to resolve the issues in dispute before the resort to litigation, but there is no information about this factor in the record. 29 U.S.C. § 1854(c)(2). In sum, although it is clear Plaintiffs and the class members are entitled to statutory damages/penalties for GLK's violations of the AWPA and the WMLA, Plaintiffs' request for a specific ruling on the amount of damages must await a more complete development of the record and the resolution of the remaining claims. With that understanding, Plaintiffs' motion for partial summary judgment (ECF No. 113) is granted in the Jimenez case as to Counts IV, V, and VII and in the Ramirez case as to Count I.

20

### C. Early Termination of Employment

#### 1. Right to continued employment

Plaintiffs claim that GLK violated the AWPA and the WMLA by terminating the employment of the 2010 and 2011 workers before the end of the term certified by the DOL in granting GLK's H-2B application. Plaintiffs also contend that GLK's early termination is actionable as a common law breach of contract. As noted above, in 2010 GLK sent half the workers home after only a month because of the poor condition of the rain-damaged crop, and the rest were sent home more than a month before the end date certified by DOL. In 2011 GLK cancelled the visas for the 35 workers included in the class in the Ramirez case after they arrived at the border for transportation to Bear Creek because of the increase in the prevailing wage determined by DOL. GLK sent the remaining workers who had already arrived home after a month and a half. In their second motion for summary judgment (ECF No. 115), Plaintiffs argue that in terminating their employment early, GLK violated the AWPA and the WMLA, and breached the contract it had entered into with the workers.

In response, GLK denies that it had any legal obligation to continue the employment of the 2010 and 2011 workers for the entire duration of the period certified by DOL. In GLK's view, the 2010 and 2011 workers were at-will employees under Wisconsin law and thus terminating their employment before the end to the period certified by DOL in 2010 and 2011 was not unlawful. In the alternative, GLK asserts that it had cause to terminate the employment early, citing the 2010 crop damage and the 2011 wage rate increase. (Defs.' Br. in Opp. at 11, ECF No. 125.)

It seems clear that both the AWPA and the WMLA are intended to require agricultural employers to offer migrant workers a specific period or term of employment. The written disclosures employers are required to make in recruiting such workers under both laws include the

21

"period" or "term" of employment being offered. 29 U.S.C. § 1831(a)(1)D); Wis. Stat. § 103.915(1)(a), (4)(a). The "period of employment" offered then becomes a part of the "working arrangement" that the employer may not violate absent "justification" in the words of the AWPA. 29 U.S.C. § 1822(c). Under the WMLA, the offered "term of employment" becomes part of the "work agreement" throughout which the worker, who can be terminated only "for cause or due to seriously adverse circumstances beyond the employer's control," is guaranteed a minimum number of hours. Wis. Stat. § 103.915(4)(b).

In this case it is undisputed that GLK failed to comply with its obligations under both laws. GLK failed to make the written disclosures required by the AWPA and the WMLA, and it failed to provide its workers with the written "work agreement" required by the WMLA. Thus, as explained above, summary judgment will be granted on these claims and Plaintiffs are entitled to statutory damages. Under the APWA, the court can award statutory damages of up to $500 for each violation, and under the WMLA, each day of continued violation constitutes a separate offense punishable by up to $100. Plaintiffs argue, however, that in addition to, or in place of, statutory damages, the members of the 2010 and 2011 Classes are entitled to damages caused by GLK's termination of their employment before the end date of the period of intended employment set forth by GLK in its Application for Temporary Employment Certification. Whether as a function of the common law of contract or by operation of the AWPA and/or the WMLA, Plaintiffs claim that GLK was obligated to continue their employment until the end of the "validity periods" certified by the DOL.

GLK argues in support of its own motion for summary judgment on these claims that its H-2B petitions did not create a contract between GLK and the workers guaranteeing them employment

for the entire certified period of employment. GLK notes that the Application for Temporary Employment Certification it submitted called for it to state the "period of intended employment," not guaranteed employment. Moreover, the Application specifically contemplates employment for a shorter period than the certified or validated period of employment. As part of the Application the employer is required to certify that it will inform H-2B workers of the requirement that they leave the U.S. "at the end of the period certified by the Department or separation from the employer, whichever is earlier." (ECF No. 87-4 at 9.)

GLK also contends that the few cases that have addressed the issue have rejected the argument that H-2B applications and job orders create contracts between the employers and the H-2B workers. In *Garcia v. Frog Island Seafood, Inc.*, for example, the court granted the defendant employer's motion for summary judgment dismissing the H-2B plaintiffs' common law contract claim for failing to provide at least forty hours of work per week during the period of employment specified in the Application for Alien Employment Certification or "Clearance Order." 644 F. Supp. 2d 696, 702, 715–16 (E.D. N.C. 2009). The court based its decision on the significant differences between the H-2A and H-2B programs. While acknowledging the similarities between the two programs, the court noted that the regulations then in effect gave significantly greater protection to H-2A workers:

> In particular, while federal regulations governing the H–2A program provide that "[i]n the absence of a separate, written work contract entered into between the [H–2A] employer and the worker, the required terms of the job order and application ... shall be the work contract," 20 C.F.R. § 655.102(b)(14); see 29 C.F.R. § 501.10(d) (defining an H–2A work contract), no similar provision exists under the H–2B regulations. See 20 C.F.R. § 655.4 (providing definitions of H–2B–related terms). In fact, under the H–2B program, foreign workers "are guaranteed only that their pay will be consistent with the prevailing wage for the assigned locality. An H–2B worker ... has no employment contract or work guarantee." *Olvera–Morales*

23

*v. Int'l Labor Mgmt. Corp.*, 246 F.R.D. 250, 253 (M.D.N.C.2007) (emphasis added): see 20 C.F.R. § 655.22(e) (explaining the H–2B employer must attest that ... "[t]he offered wage equals or exceeds the highest of the prevailing wage, the applicable Federal minimum wage, the State minimum wage, and local minimum wage, and the employer will pay the offered wage during the entire period of the approved H–2B labor certification").

*Garcia*, 644 F. Supp. 2d at 717.

GLK also denies that it entered into a contract for a specific term of employment even aside from the H-2B Program. GLK notes that under Wisconsin law, a valid contract requires an offer, acceptance and consideration. (Defs.' Br. in Supp. of Mot. for Summ. J. at 25, ECF No. 110) (citing *Briggs v. Miller*, 176 Wis. 321, 325, 186 N.W.2d 163 (1922)). Because the H-2B applications were submitted to the DOL and not the workers, and because the workers acknowledge that neither GLK, nor anyone acting on its behalf, promised them a specific term of employment, GLK argues that their employment was at will. In other words, either party was free to terminate the relationship at will. (*Id.* at 26.)

Notwithstanding the court's decision in *Garcia v. Frog Island Seafood*, an argument can be made that employment under the H-2B program is not at will. The regulation governing the employer's duty to notify the Department of Homeland Security upon separation of the worker from employment before the end of the period specified in the employer's application specifically notes that "[e]mployees may be terminated for cause." 20 C.F.R. § 655.22(f). The statement that employees can be terminated for cause implies that they cannot be terminated absent cause; in other words, that they are not at will employees.

Plaintiffs' argument, however, does not rest on the regulations governing the H-2B program; it rests on the statutory protections granted them by the AWPA and the WMLA, and the common

law of contract. The AWPA requires agricultural employers who recruit migrant agricultural workers to disclose to them in writing the period of employment as part of the working arrangement. 29 U.S.C. § 1821(a)(4). The WMLA similarly requires the employer to provide the worker with a written "work agreement" containing a specific "term of employment." Wis. Stat. § 103.915(1)(b) and (4)(a). In addition, the AWPA prohibits the employer from violating the working arrangement absent justification, 29 U.S.C. § 1822(c), and the WMLA guarantees the worker's employment until the expiration of the term unless the worker is terminated for cause or due to seriously adverse circumstances beyond the employer's control. Wis. Stat. § 103.915(4)(b). This is not at will employment.

It is true that GLK failed to make the disclosures to the 2010 and 2011 workers that both the AWPA and the WMLA require, and it failed to provide them the written "work agreement" that the WMLA requires. But this does not mean GLK is not bound by the remaining provisions of those laws. An employer should not be rewarded when it fails to provide its employees with the written disclosures and agreements the AWPA and WMLA require by freeing it from its obligation to comply with the work arrangement and/or agreement it entered into with them. Here, it is undisputed that GLK entered into working arrangements or agreements with the 2010 and 2011 workers who actually traveled to Bear Creek; they were carrying out their obligations under the arrangement/agreement when they were terminated. Even the class members in the Ramirez case, who never left Mexico, had already entered into arrangements/contracts with GLK at the time GLK instructed them to return to their homes. It is undisputed that GLK made job offers to them and that they accepted those offers. (Resp. to PSUF ¶¶ 58, 62, ECF No. 126.) The executory contract

formed thereby was more than enough to create a work arrangement within the meaning of the AWPA.

Given the fact that GLK entered into work arrangements/agreements with the 2010 and 2011 workers that were not terminable at will, the question that remains is what were the terms of those agreements. Since GLK failed to disclose any other term, the only reasonable answer to that question is the term of employment that GLK placed in the Application for Temporary Worker Certification it submitted to the DOL. In 2010, the period of intended employment was from August 9, 2010, to November 30, 2010. (ECF No. 117-8 at 10.) And in 2011, the period of intended employment was from August 1, 2011, to November 15, 2011. (ECF No. 117-9 at 10.) Not to incorporate those terms into GLK's arrangements/agreements with the workers would make the employment agreements indefinite. In Wisconsin, "[i]t is the general rule that where a contract fails to specify a time of duration, 'it may be inferred that the parties thereto intended the contract to run for a reasonable time . . . . What constitutes a 'reasonable time' . . . is usually an implication of fact . . . derivable from language used by parties considered in context of subject matter and attendant circumstances, in aid of apparent intention.'" *Amoco Oil Co. V. Capitol Indem. Corp.*, 95 Wis. 2d 530, 551, 291 N.W. 2d 883 (Ct. App. 1980) (quoting 17A C.J.S. Contracts § 398 at p. 480 (1963)). Given the context and surrounding circumstances, using the end date of the certification period as the term of the arrangements/agreements appears reasonable.

Courts that have considered this issue in the context of the AWPA have generally reached the same conclusion. In *De Leon-Granados v. Eller & Sons Trees, Inc.*, for example, the court held that the "terms of employment submitted to the Department of Labor by the employers of AWPA-covered workers are incorporated into the workers' § 1822(c) working arrangements." 581

26

F.Supp.2d 1295, 1324 (N.D. Ga. 2008) (citing *Donaldson v. United States Dep't of Labor*, 930 F.2d 339, 350 n. 13 (4th Cir. 1991); *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334 (5th Cir. 1985) (decided under AWPA's predecessor statute); *Williams v. Tri-County Growers, Inc.*, 747 F.2d 121, 133 (3d Cir. 1984) (same). The *De Leon-Granados* court further noted that because the AWPA protects "working arrangements" and not simply contracts, the fact that the workers may never have seen the applications GLK submitted to the DOL in order to have the H-2B visas issued is irrelevant. "[T]he privity requirements of contract law are inapplicable to Plaintiffs' statutory claim to enforce a working arrangement." *De Leon-Granados*, 581 F.Supp.2d at 1325.

It is true that in *Reyes v. Remington Hybrid Seed Co., Inc.*, the Seventh Circuit held that the AWPA "is silent about guarantees of work." 495 F.3d 403, 405 (7th Cir. 2007). *Reyes*, however, dealt with the question of whether an agricultural employer could be held liable for promises made to recruit migrant workers by a contractor who acted without authority to bind the employer. The only two statutes addressed by the court were the AWPA and the FLSA. There is no discussion in that case about the relationship between the AWPA and DOL-approved clearance orders or the employer's Application for H-2B Temporary Workers. Indeed, the court expressly noted that "the AWPA does oblige employers to disclose 'the period of employment.'" *Id.* at 406 * (quoting 29 U.S.C. § 1821(a)(4)). For these reasons, I do not view *Reyes* as dispositive of this issue and adopt the analysis in *De Leon-Granados*.

The same analysis applies to Plaintiffs' claim under the WMLA. The WMLA requires the agricultural employer to provide the migrant worker with a "work agreement." The work agreement is required to set forth a term of employment and a minimum work guarantee. Wis. Stat. § 103.915(4)(a), (b). Having failed to provide the required written agreement, GLK cannot be

27

rewarded for its violation of the WMLA where it otherwise disclosed the term of employment it intended to offer the workers. Nor can GLK avoid the statutorily required work guarantee by failing to include it in the required work agreement.

It thus follows that the 2010 and 2011 workers were entitled to continued employment under the AWPA and the WMLA during the validity periods certified by DOL. But the right to continued employment was not absolute. Both the AWPA and the WMLA permit earlier termination under certain circumstances. The AWPA only prohibits termination of employment "without justification." 29 U.S.C. § 1822(c). The WMLA allows earlier termination of a worker for cause or "due to seriously adverse circumstances beyond the employer's control." Wis. Stat. 103.915(4)(b). It is to the question of whether GLK's termination of the arrangements/agreements was without justification or due to seriously adverse circumstances beyond the employer's control that the Court now turns.

### 2. "Without justification" or "due to seriously adverse circumstances"

GLK claims it decided to send workers home before the end of the period certified by DOL in 2010 because of the 80% crop loss due to the devastating rains that occurred that summer. It contends that it decided in 2011 to return the two groups of workers who arrived at its Bear Creek facility back to Mexico shortly after their arrival, and not to even transport the third group to Bear Creek, because of the substantial increase in the prevailing wage that the DOL placed in effect just as the workers were beginning to leave Mexico. Arguably, these facts support a finding that GLK's violation of the working arrangement was not "without justification" within the meaning of the AWPA, and that its termination of the employment of the workers was "due to serious adverse circumstances beyond the employer's control" within the meaning of the WLMA.

28

As a threshold issue, Plaintiffs argue that GLK waived these defenses by failing to plead them in its answer to the second amended complaints filed in the two actions. The general rule is that an affirmative defense must be asserted in a responsive pleading. Fed. R. Civ. P. 8(c). An affirmative defense that is not timely pleaded is waived. *Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997); *Castro v. Chicago Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004) ("We have stated numerous times that if a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived."). Even if the defenses were not waived by failing to assert them in their answers, however, Plaintiffs contend that the defenses fail on the merits. The defenses fail for the 2010 workers, Plaintiffs contend, because the crop losses due to flooding were already well-known to GLK before the workers left Mexico. The defenses fail on the merits for the 2011 workers because the 2011 wage increase for H-2B workers announced (but never implemented) by the federal government does not excuse performance under either the AWPA or the WMLA as a matter of law. (Pls.' Reply Br. in Supp. of Mot. for Partial Summ. J. at 11, ECF No. 129.) GLK compounds their error, Plaintiffs argue in reply, by failing to respond to Plaintiffs' waiver argument, as well as their argument that the defenses fail on their merits, in its brief in opposition to Plaintiffs' motion for summary judgment. (*Id.* at 12.)

Plaintiffs' waiver argument has merit. GLK has offered no response to Plaintiffs' argument that it waived the statutory defenses to termination of the arrangements/agreements under the AWPA and WMLA by failing to plead them. An argument can be made that GLK's failure to plead the statutory defenses in its answers to the amended complaints does not constitute a waiver. Just cause for termination of a contract is not among the enumerated defenses listed in Rule 8(c), and it is not clear whether it otherwise meets the definition of an affirmative defense. *See Winforge, Inc.*

*v. Coachmen Industries, Inc.*, 691 F.3d 856, 872 (7th Cir. 2012) (noting that the question whether a defense is an affirmative defense when not specifically listed in Rule 8(c) is not well settled). It also seems doubtful that Plaintiffs were prejudiced by GLK's failure to plead these defenses in its answers to the amended complaints. But GLK does not offer such an argument, and it is not the role of the court to make it for it. *Vaughn v. King*, 167 F.3d 347, 354 (7th Cir. 1999) ("It is not the responsibility of this court to make arguments for the parties.").

GLK also ignored Plaintiffs' lengthy argument on the merits. Plaintiffs devoted nine pages of their brief in support of their motion for summary judgment to the argument that the reasons asserted by GLK for terminating the workers' employment early do not constitute cognizable justifications or defenses under the AWPA or the WMLA. (Pls.' Br. in Supp. of Mot. for Partial Summ. J., Part VII, at 27–36, ECF No. 116.) In their brief in opposition, GLK offered a one-sentence argument in response: "Further, GLK had cause to terminate the workers' employment: the devastating rains which ruined the crops in 2010 and the much higher than anticipated wage rates to be imposed by the Federal Government in 2011." (Defs.' Br. in Opp. at 11, ECF No. 125.) It is true that GLK devoted a page to reciting the facts that led up to the decisions to send the workers back early in 2010 and 2011, but it ignores entirely the statutory defenses set out in the AWPA and the WMLA, arguing instead that the workers were only at will employees. This, too, constitutes a waiver of the issue. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it before the district court."). Under these circumstances, the defenses must be considered waived.

The result would be the same even absent waiver of the issue, however. As noted above, the AWPA prohibits early termination in violation of the work arrangement "without justification." 29

30

U.S.C. § 1822(c). The AWPA regulations explain: "Normally, 'without justification' would not include situations in which failure to comply with the terms of any working arrangements was directly attributable to acts of God, due to conditions beyond the control of the person or to conditions which he could not reasonably foresee." 29 C.F.R. § 500.72(a). The WMLA similarly requires the employer to continue the workers employment for the term of the work agreement unless it is terminated "due to serious adverse circumstances beyond the employer's control." Wis. Stat. § 103.915(4)(b). Under the Wisconsin regulations, "[t]he term 'seriously adverse circumstances beyond the employer's control' means the substantial shutdown of the employer's operations for reasons including, without limitation because of enumeration, loss of crops, loss of, or inability to operate facilities or inability to store or process unmarketable, perishable agricultural produce; such term shall not apply to the shutdown of the employer's operation for change over of equipment or between packs or crops." Wis. Adm. Code. § DWD 301.06(9).

GLK contends that in 2010 the anticipated harvest was 90,000 tons of cabbage. Because of excess rains and flooding, they contend that the actual harvest was only 20% of the anticipated amount. While it is true that crop loss could amount to "justification" under the AWPA and "serious adverse circumstances" under the WMLA, Plaintiffs note that the flooding occurred before the end of the cutting season in Wisconsin and was apparent as early as June. It led to an outbreak of black rot that caused serious damage to the cabbage crop. Plaintiffs contend that the damage to the crop was evident as early as July, significantly before any of the workers were brought to Wisconsin. Moreover, GLK was aware of the damage and initially planned to bring up only 55 of the 110 workers that were authorized. It later reversed the decision and decided to bring in 86 workers even though it knew that the crop damage would lead to a shortened season.

31

Given the knowledge GLK had of the crop damage before the workers were called up, the 2010 rains do not amount to justification under the AWPA or "serious adverse circumstances beyond the employer's control" under the WMLA. The justification required under the AWPA refers to conditions the employer "could not reasonably foresee." 29 C.F.R. § 500.72(a); *see Cruz v. Vel-A-Da, Inc.*, No. 1993 WL 658968, at *4 (N.D. Ohio June 9, 1993) (holding that severe drought did not justify violating work arrangement under AWPA when employers were aware of it when they hired workers). GLK offers no argument in response to Plaintiffs' contention that not only was the crop damage foreseeable, it already had occurred before the workers even left their homes. And while the rain and flooding may have been beyond the employer's control, the losses to the workers resulting from the shortened season were not. Finally, GLK does not claim that its operations were substantially shut down as a result of the crop loss as the WMLA requires in order the justify early termination of the workers' employment. § DWD 301.06(9). Thus, even on the merits, the defense that the early termination of the 2010 workers was justified fails.

The same is true for the 2011 workers. GLK decided to send two groups of the workers home almost immediately after they arrived, and notified the third group they would not be coming after they arrived at the border, because the DOL increased its prevailing wage determination. GLK complains that the wage increase amounted to an 87% increase over the previous year. In fact, however, the DOL had already increased the wage from $7.85 to $10.36 before GLK decided to recruit the 2011 H-2B workers. Thus, GLK knew that the prevailing wage rate was significantly higher than the previous year when they recruited the H-2B workers in 2011. It is true that the DOL revised its methodology for determining the prevailing wage and ordered another increase to $14.68 that was to take effect January 1, 2012, so as "to provide employers with sufficient time to plan for

32

their labor needs for the next year and to minimize the disruption to their operations." 76 Fed. Reg. 3452-01, 3462. It was in response to this second increase that GLK decided to terminate GLK's H-2B workers, but only after another court held DOL's delayed effective date illegal and it was moved up to September 30, 2011. *Comite De Apoyo A Los Trabajadores Agricolas v. Solis*, No. 09-240, 2011 WL 2414555, *1 (E.D. Pa. June 16, 2011); 76 Fed. Reg. 45667-01 (Aug. 1, 2011). GLK received notice of the new effective date just as the H-2B workers were departing for the United States from Mexico. GLK notes that GLK appealed the increase but its appeal was initially rejected. GLK decided at that point that it was not economically viable to pay the new rate for the work to be performed and transported the workers back to the Mexico border. In fact, the September 30, 2011 effective date was later stayed indefinitely due to legal challenges. 76 Fed. Reg. 59896-01 (Sept. 28, 2011).

A wage increase that never went into effect does not constitute justification for violating a work arrangement under the AWPA; nor does it constitute the kind of serious adverse circumstance beyond the employer's control that would justify terminating the employment of migrant workers under the WMLA before the term of the work agreement. Even if the increase had gone into effect, GLK has offered no evidence that the 40% increase over the previous determination would have led to "the substantial shutdown of the employer's operations" or the "inability to operate facilities or inability to store or process unmarketable, perishable agricultural produce." Wis. Adm. Code. § DWD 301.06(9). Plaintiffs note that the increase in the prevailing wage paid to H-2B workers would have increased GLK's total labor costs by less than 3%. (PSUF ¶¶ 121, 122, ECF No. 126.) GLK offers no evidence or argument to suggest that an increase of this amount would have significantly affected its business.

33

Accordingly, Plaintiffs are entitled to summary judgment on the claim that GLK violated the AWPA and WMLA and breached its contracts with the 2010 and 2011 workers when it terminated their employment without justification. Plaintiffs' motions on these claims will be granted and GLK's motions denied.

## D. Failing to Reimburse Pre-Employment Expenses and Provide Return Transportation

Plaintiffs also claim that GLK violated the AWPA, the WMLA and the Wisconsin's wage payments and living wage laws by failing to pay their wages at the mandated prevailing wage rate in 2010 and 2011. Additionally, Plaintiffs claim that GLK violated the AWPA by failing to pay their return transportation after it prematurely terminated their employment in 2010 and 2011. There is no dispute that GLK calculated the workers paychecks using the prevailing wage set by the DOL for the H-2B workers in 2010 and 2011. There is also no dispute that GLK transported the workers back to the Mexican border after it terminated their employment each year at its own expense. Plaintiffs contend, however, that because the visa and travel expenses they incurred in coming to Bear Creek were primarily for the benefit of the employer, GLK was required to reimburse the workers for those expenses. As a result of GLK's failure to do so, Plaintiffs contend, their wages for their first week fell below the mandated prevailing wage in violation of the AWPA, the WMLA, and Wisconsin's wage payment law. Indeed, Plaintiffs contend that the Court has already decided the issue by holding in its previous decision that GLK violated the FLSA by failing to reimburse the workers' travel and visa expenses to the extent needed to prevent their first week wages from falling below the federal minimum wage. The Court's finding of liability on their FLSA claims, Plaintiffs contend, *ipso facto* leads to the conclusion that GLK violated the AWPA. (Pls.' Br. in Supp. at 24, ECF No. 116.) As to the outbound travel expenses, Plaintiffs contend that GLK was required to pay

34

the cost of the workers' return to their homes, not just to the border. I will address each issue separately beginning with the return expenses.

### 1. Return transportation

GLK offers no response to Plaintiffs' argument that it violated the AWPA and the WMLA by failing to pay for their return to their homes. The H-2B regulation under which GLK applied for foreign workers expressly provides: "If dismissed by the employer prior to the end of the period, the employer is liable for return transportation." 20 C.F.R. § 655.22(m) (2009). This obligation is derived directly from the statute governing the H-2B visa program which states: "In the case of an alien who is provided non-immigrant status under section 1101(a)(15)(H)(i)(b) or 1101(a)(15)(H)(ii)(b) of this title and who is dismissed from employment by the employer before the end of the period of authorized admission, the employer shall be liable for the reasonable costs of return transportation of the alien abroad." 8 U.S.C. § 1184(c)(5)(A).

As part of its H-2B application GLK certified that it would provide such transportation as a condition of employment. This obligation became part of the work arrangement/agreement GLK formed with each of the workers it recruited. *De Leon-Granados*, 581 F. Supp. 2d at 1318. Moreover, because the obligation is incorporated into the parties' working arrangement, the breach of that obligation is actionable as a violation of the "working arrangement" under AWPA § 1822(c). *Id.* at 1317–18 (citing *Donaldson*, 930 F.2d at 349–50 (holding violation of law providing no private right of action was nonetheless actionable under the AWPA)).

As noted above, it is undisputed that GLK transported the workers back to the Mexican border after it no longer needed their work. Neither the statute nor the regulation explicitly state that the employer is required to transport the workers to their homes. It is perhaps arguable that

35

GLK satisfied its obligation to provide "return transportation of the [workers] *abroad*" when it returned the workers to the Mexican border, but this would have still left the workers some 600 miles from their homes in Santiago Capitiro. GLK does not offer that argument, however, and the Court would have rejected it in any event. The purpose of both the AWPA and the WMLA is to protect workers from exploitation. That purpose is better served by construing "return transportation" as transportation from the job site back to the workers' homes, as opposed to six hundred miles away. Indeed, when asked whether GLK provided transportation for its dismissed workers all the way back to Santiago Capitiro, Defendant Downs testified in his deposition that he was "certain" that GLK had provided it. (Downs Dep. Tr. 115–117.) Downs indicated that his certainty was based on records he had reviewed. The records he was referencing, if they exist, are not in the summary judgment record. As noted above, GLK makes no argument, factually or legally, on this issue. Summary judgment will therefore be granted as to GLK's liability for workers expenses returning home.

### 2. Payment of wages when due

GLK also does not respond to the argument that FLSA violations are "*ipso facto*" AWPA violations, other than to repeat its argument that no law required GLK to directly reimburse these expenses in the first place. In other words, GLK makes the same argument the Court rejected in its decision granting in part Plaintiffs' motion for summary judgment on the FLSA claim. More specifically, GLK reiterates its argument that in creating the H-2B visa program for guest workers, Congress explicitly declined to require employers to pay workers' pre-employment expenses. (Pls.' Reply in Supp. of Mot. for Summ. J. at 2, ECF No. 130) ("[N]othing in the statutory or regulatory

36

regime for the H-2B program expressly states that inbound travel expenses must be advanced or reimbursed by an employer of an H-2B worker.").

As explained in the Court's previous decision, however, GLK's obligation to reimburse its H-2B workers for their visa and inbound travel expenses arises not from the H-2B statute and regulations, but from DOL regulations regarding the federally mandated minimum wage. (ECF No. 119.) Under the "free and clear" rule, an employer must pay the minimum wage free and clear of any expenses that primarily benefit the employer. 29 C.F.R. § 531.35. Expenses that primarily benefit the employer may not be deducted from the workers' wages and, where paid by the worker in the first instance, must be reimbursed by the employer, in order to avoid reducing wages below the minimum wage. 29 C.F.R. § 531.32(c). The DOL has determined that visa and travel expenses for foreign workers recruited under the H-2B program primarily benefit the employer who certifies to the DOL as part of the application process that there are no domestic workers to perform the work it requires. (DOL Field Assistance Bulletin 2009-1, Ex. 65 to PSUF, ECF No. 87-73.) The same conclusion has been reached by most courts that have considered the question in relation to the H-2B or H-2A programs. *See, e.g., Arriaga v. Florida-Pacific Farms, LLC*, 305 F.3d 1228, 1236 (11th Cir. 2002); *Rivera v. Peri & Sons Farms, Inc.*, 735 F.3d 892 (9th Cir. 2013); *De Leon-Granados v. Eller & Sons Trees, Inc.*, 581 F.Supp.2d 1295 (N.D. Ga. 2008); *Moodie v. Kiawah Island Inn Co., Inc.*, 124 F.Supp.3d 711 (D. S.C. 2015); *but see Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393 (5th Cir. 2010) (holding that inbound travel and visa expenses of H-2B

workers not reimbursable). In short, the Court declines to reconsider its early decision on this issue, and therefore rejects GLK's argument.[11]

Essentially, Plaintiffs argue now that GLK's failure to reimburse these expenses is actionable not only as a failure to pay the minimum wage under the FLSA but also as a failure to pay the "prevailing wage" under the AWPA. Plaintiffs are correct. As noted above, the AWPA "working arrangement" is deemed to incorporate applicable federal laws and regulations, which would include the "free and clear" rule. *See De Leon-Granados*, 581 F. Supp. 2d at 1316–17 ("The AWPA wage and working arrangement provisions have been held to incorporate applicable federal and state law and regulations, including, inter alia, the obligations imposed by the FLSA." (citing *Donaldson*, 930 F.2d at 349–50)). Therefore, "Where an employer is required to pay a prevailing wage higher than the federal minimum wage, an employer is precluded from making deductions for its own benefit that reduce employee pay below the mandated prevailing wage." *Id.* at 1319. Ultimately, it makes sense that GLK's failure to pay a minimum wage of $7.25 would also constitute a failure to pay the "prevailing wage" of $7.85 in 2010 and $10.36 in 2011.

The same conclusion follows with respect to Plaintiffs' claim under Wisconsin's living wage law, which in 2010 and 2011 mandated a "living wage" of $7.25 and hour. Wisconsin's wage and hour laws are generally interpreted consistently with the FLSA and federal regulations. *Madely v. RadioShack Corp.*, 2007 WI App 244, ¶ 13, 306 Wis. 2d 312, 742 N.W.2d 559. Whether the state statutory violation entitles Plaintiffs to any additional relief is not clear. *See Dexter v. Ministry*

---

[11] In its previous decision, the Court indicated that food and lodging expenses were not included in the travel expenses. (ECF No. 119 at 22.) This was incorrect. When the food and lodging expenses are incurred away from home for the benefit of the employer, they are not part of the employee's wages. 29 C.F.R. § 778.217.

*Health Care*, 2015 WL 1326361, *3 (W.D. Wis. March 25, 2015) (noting rule prohibiting double recovery in preliminary approval of settlement of state and federal wage claims); *General Tel. Co. of the Northwest , Inc. v. EEOC*, 446 U.S. 318, 333 (1980) ("It also goes without saying that the courts can and should preclude double recovery by an individual."). But summary judgment as to liability is also appropriate as to the living wage claim in the Jimenez case.

### E. Personal Liability of GLK's President

Plaintiffs also argue that GLK's president, Ryan Downs, should be personably liable, jointly and severally with GLK, for any AWPA and WMLA violations. (The breach of contract claims were not asserted against Downs, but only GLK.) The AWPA defines an "agricultural employer" as "any person who owns or operates a farm, ranch, processing establishment, . . . [or] cannery, . . . and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 C.F.R. § 1802(2). There is no question that Downs falls within this very broad definition.

The only argument the defendants provide is that Plaintiffs have "failed to show how Ryan Downs was involved in any of these record-keeping requirements," meaning, presumably, the failure to make and keep records of workers' permanent addresses, and perhaps also the non-disclosure of work term and non-provision of work agreement violations. (*See* Defs.' Br. in Opp. at 25, ECF No. 125.) It is clear that Downs was the individual at GLK responsible for such standard business practices as record-keeping and recruiting, however. It is undisputed that Downs personally met with DOL and WDWD agents in previous years to discuss GLK's obligations under the AWPA and WMLA. (*See* Defs.' Resp. to PSUF ¶¶ 136, 139, 156–57.) For example, Downs was present when DOL investigators were reassured in 2008 that GLK would comply with the APWA. Similarly,

39

although Downs was not personally involved in face-to-face recruiting activities, the individual who was supposed to be—Rafeal Arroyo—was acting under the direction and control of Downs. Accordingly, joint and several liability is appropriate as to the AWPA and WMLA violations found above.

## III. ORDER

Plaintiffs' unopposed motion to modify the scope of class certification in the Ramirez case is **GRANTED**.

Plaintiffs' motion for summary judgment as to liability and damages on Counts IV, V and VII in the Jimenez case and Count I in the Ramirez case is **GRANTED-IN-PART AND DENIED-IN-PART**. It is denied as to damages but granted in all other respects.

Plaintiffs' motions for summary judgment on Counts III, VI, VII and VIII in the Jimenez case and Counts I and II in the Ramirez case are **GRANTED**.

GLK's motions for summary judgment on Counts III, VI, and VIII in the Jimenez case and Counts I and II in the Ramirez case are **DENIED**.

**SO ORDERED** this  23rd  day of May, 2016.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

40